1  JONATHAN W. HUGHES (SBN: 186829)
2  jonathan.hughes@arnoldporter.com
   ARNOLD & PORTER KAYE SCHOLER LLP
3  Three Embarcadero Center, 10th Floor
4  San Francisco, CA  94111
   Telephone:  (415) 471-3100
5  Facsimile:   (415) 471-3400

6
   JEFFREY B. MALTZMAN (SBN: 131758)
7  jeffreym@maltzmanpartners.com
8  MALTZMAN & PARTNERS, P.A.
   681 Encinitas Boulevard, Suite 315
9  Encinitas, CA 92024
   Telephone:  (760) 942-9880
10 Facsimile:   (760) 942-9882

11
12 Attorneys for Defendant PRINCESS CRUISE LINES, LTD.
   (additional counsel on signature page)
13

14            UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA

16 SUSAN DORETY, INDIVIDUALLY          Case No. 2:20-CV-03507-RGK-SK
17 AND ON BEHALF OF THE ESTATE         Action Filed:  April 15, 2020
   OF MICHAEL DORETY,
18                                     **MEMORANDUM OF POINTS AND**
                Plaintiff,             **AUTHORITIES IN SUPPORT OF**
19                                     **DEFENDANT'S MOTION FOR**
20      v.                            **SUMMARY JUDGMENT**

21 PRINCESS CRUISE LINES, LTD.,        Date: September 13, 2021
22                                     Time: 9:00 a.m.
                Defendant.            Judge: Hon. R. Gary Klausner
23                                     Courtroom: 850
24
25                                     Magistrate: Hon. Steve Kim
                                       Filed: August 16, 2021
26
27
28

---

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.          2:20-CV-03507-RGK-SK

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    A.    COVID-19's Discovery and Early Public Health Guidance ................. 1

    B.    Princess Implemented Screening Measures for *Grand Princess* Based on CDC and WHO Guidance ........................................................ 3

    C.    No COVID-19 Cases, or Suspect Cases, Were Detected on *Grand Princess*'s February 11 Voyage ...................................................... 4

    D.    Princess Implemented CDC Guidelines for *Grand Princess*'s February 21 Cruise .................................................................................. 5

    E.    State and Federal Authorities Managed Disembarkation ...................... 6

    F.    COVID-19 Becomes a Global Pandemic After Disembarkation .......... 8

LEGAL STANDARD .............................................................................................. 8

ARGUMENT ........................................................................................................... 9

I.    There Is No Evidence Establishing that Princess Had Actual or Constructive Knowledge of a Risk-Creating Condition ................................. 9

    A.    A Cruise-Ship Owner Must Have Actual or Constructive Notice of the Specific Risk-Creating Condition to be Liable for Negligence ............................................................................................. 9

    B.    Princess Lacked Notice of Any Risk-Creating Conditions ................ 11

        1.    Princess Undisputedly Lacked Actual or Constructive Notice of the Presence of COVID-19 on *Grand Princess* ......... 11

        2.    Princess Provided Prompt Warnings to Passengers and Implemented All Measures Recommended by CDC ................. 14

        3.    None of Plaintiff's Evidence Establishes Notice ....................... 15

    C.    Even if Princess Had Notice of a Specific Risk-Creating Condition, Princess Undisputedly Was Not Negligent ........................ 18

    D.    Plaintiff's Theory Would Upend Maritime Commerce and More ....... 23

II.    Plaintiff Seeks Two Categories of Damages that are Unavailable ................ 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................. 8

*Archer v. Carnival Corp. & PLC*,
  2020 WL 7314847 (C.D. Cal. Nov. 25, 2020) ....................................... 9, 12, 13, 25

*Barbetta v. S/S Bermuda Star*,
  848 F.2d 1364 (5th Cir. 1988) ................................................. 21

*Casorio v. Princess Cruise Lines, Ltd.*,
  677 F. App'x 361 (9th Cir. 2017) ................................................. 20, 21

*Chamberlain v. Chandler*,
  5 F. Cas. 413 (C.C.D. Mass. 1823) ................................................. 25

*Churchill v. F/V Fjord*,
  892 F.2d 763 (9th Cir. 1988) ................................................. 20

*Davis v. Cruise Operator, Inc.*,
  2017 WL 3057610 (S.D. Fla. July 19, 2017) ................................................. 11, 17

*Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*,
  927 F.2d 187 (4th Cir. 1991) ................................................. 13, 16, 18, 19, 20, 24

*Dooley v. Korean Air Lines Co.*,
  524 U.S. 116 (1998) ................................................. 25

*Esso Std. Oil S.A. v. S.S. Gasbras Sul*,
  387 F.2d 573 (2d Cir. 1967) ................................................. 21, 23

*Everett v. Carnival Cruise Lines*,
  912 F.2d 1355 (11th Cir. 1993) ................................................. 18

*Ford v. Carnival Corp.*,
  2021 WL 3500959 (C.D. Cal. Aug. 9, 2021) ................................................. 9

*Francis v. MSC Cruises, S.A.*,
  2020 WL 6816963 (11th Cir. Nov. 20, 2020) ................................................. 11

ii

*Gabbard v. Linn-Benton Hous. Auth.*,
   219 F. Supp. 2d 1130 (D. Or. 2002) ...................................................... 23

*Garcia v. Superior Ct.*,
   42 Cal. App. 4th 177 (1996) ................................................................ 25

*Garcia v. Whitehead*,
   961 F. Supp. 230 (C.D. Cal. 1997) ....................................................... 24

*Keefe v. Bahama Cruise Line, Inc.*,
   867 F.2d 1318 (11th Cir. 1989) ............................................................. 9

*Kressly v. Oceania Cruises*,
   718 F. App'x 870 (11th Cir. 2017) ....................................................... 10

*Leftow v. Princess Cruise Line, Ltd.*,
   2018 WL 6133714 (C.D. Cal. Jan. 11, 2018) ...................................... 21

*Mann v. Carnival Corp.*,
   385 F. Supp. 3d 1278 (S.D. Fla. 2019) ................................................ 23

*McGuire v. The Golden Gate*,
   16 F. Cas. 141 (C.C.N.D. Cal. 1856) ................................................... 25

*McKee v. Cutter Lab'ys, Inc.*,
   866 F.2d 219 (6th Cir. 1989) ......................................................... 16, 19

*Monteleone v. Bahama Cruise Line, Inc.*,
   838 F.2d 63 (2d Cir. 1988) .................................................................. 10

*M.P. Howlett, Inc. v. Tug Michael Moran*,
   425 F.2d 619 (2d Cir. 1970) ................................................................ 22

*Navarro v. Carnival Corp.*,
   2020 WL 1307185 (S.D. Fla. March 19, 2020) ................................... 17

*Reming v. Holland Am. Line Inc.*,
   662 F. App'x. 507 (9th Cir. 2016) ....................................................... 10

*Saltzstine v. Princess Cruise Lines Ltd.*,
   2020 WL 8475998 (C.D. Cal. Oct. 23, 2020) ........................... 11, 15, 17

*Samuels v. Holland Am. Line-USA Inc.*,
   656 F.3d 948 (9th Cir. 2011) ....................................... 8, 9, 10, 14, 17, 18

*Seaman v. Seacor Marine L.L.C.*,
   326 F. App'x 721 (5th Cir. 2009) ........................................................................ 23

*Taiariol v. MSC Crociere S.A.*,
   677 F. App'x 599 (11th Cir. 2017) ...................................................................... 17

*The Dutra Grp. v. Batterton*,
   139 S. Ct. 2275 (2019) ................................................................................. 24, 25

*Tonelli v. NCL (Bahamas) Ltd.*,
   428 F. Supp. 3d 1313 (S.D. Fla. 2019) ................................................. 9, 11, 16, 18

*Weiner v. Carnival Cruise Lines*,
   2012 WL 5199604 (S.D. Fla. Oct. 22, 2012) .......................................................... 9

*Zaccone v. Am. Red Cross*,
   872 F. Supp. 457 (N.D. Ohio 1994) .................................................................... 19

**<u>Statutes</u>**

46 U.S.C. § 30303 .......................................................................................... 25

Cal. Code Civ. Proc. § 377.34 .......................................................................... 24

**<u>Other Authorities</u>**

85 Fed. Reg. 16,628 .......................................................................................... 7

Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5:4 (6th ed. 2020) ................. 19

iv

**INTRODUCTION**

Under maritime law, shipowners are liable for negligence only if they had actual or constructive knowledge of a specific risk-creating condition. A shipowner's knowledge must be particularized—not just to the risk that caused injury, but to the specific time and location where plaintiffs claim to have been injured. This case flies in the face of these principles. Plaintiff faults Defendant Princess Cruise Lines, Ltd. for not preventing a COVID-19 outbreak on *Grand Princess* in February 2020. But the undisputed facts are that Princess had no knowledge that anyone infected or even suspected of being infected was on *Grand Princess*. The facts are also undisputed that Princess followed and in key ways exceeded guidance from the Centers for Disease Control and Prevention (CDC) on screening for and containing COVID-19. Plaintiff's case reduces to the theory that Princess should have known *in February 2020* that CDC and other public health authorities were wrong about COVID-19, from how it could be detected and contained to whether it was already widely present and spreading in the community in the United States. Courts reject hindsight-based theories of liability like those Plaintiff embraces. So should this Court.

**BACKGROUND**

**A.    COVID-19's Discovery and Early Public Health Guidance**

On December 31, 2019, the World Health Organization (WHO) picked up a statement from China's Wuhan Municipal Health Commission about cases of a pneumonia-like disease in Wuhan, China. (Tarling Decl., Ex. 1, at 1; Jerome Rep. 5, Hughes Decl., Ex. 1.) On January 9, WHO announced that a new coronavirus, SARS-CoV-2, was associated with this illness. (Tarling Decl. ¶ 10 & Ex. 2 at 1.) With limited information, public authorities, including WHO and CDC, developed guidance to detect and prevent COVID's spread. (*Id.* ¶¶ 10, 12-16 & Exs. 3, 5-7.) This guidance reflected a belief that COVID-19 was contained in China and was principally spread by symptomatic persons. (*Id.* ¶¶ 12-13, 20-24; Jerome Rep. 9, Hughes Decl., Ex. 1.) CDC did not confirm the first U.S. case until January 21: a

1

Washington resident who recently returned from Wuhan. (Tarling Decl. ¶ 22.) U.S. cases rose to five on January 26, but CDC emphasized that all were related to travel from Wuhan and immediate risk to Americans was low. (*Id.* ¶ 22.) CDC confirmed this approach in guidance issued on February 1, 2020 for identifying suspected cases of COVID-19. (Tarling Decl. ¶ 15 & Ex. 5.) Suspect cases required both (1) an epidemiological link from travel to China or close contact with a person known to have COVID-19, <u>and</u> (2) fever or symptoms of lower respiratory illness (e.g., cough or shortness of breath). (*Id.*) Symptoms *alone* were insufficient. (*Id.*)

Public health authorities updated their guidance, but through the sailing of *Grand Princess* adhered to the same principles requiring symptoms *plus* an epidemiological link. (Tarling Decl. ¶¶ 28, 34.) On February 10, for example, CDC issued Interim Guidance for cruise ships that again limited suspect cases of COVID-19 to those with symptoms "plus travel history in China or other known exposure at the time of embarkation." (*Id.* ¶ 16 & Ex. 6 at 2.) Likewise, just nine days before Plaintiff's cruise departed, CDC's February 12 guidance for evaluating and reporting "persons under investigation" (PUIs) for COVID-19 limited PUIs to individuals with both symptoms *and* travel in China or close contact with a confirmed case. (Nair Decl. ¶ 7 & Ex. A at 1-2.) None of this guidance advised widespread mask-wearing or social distancing, or use of temperature checks or other medical examinations to screen passengers. (Tarling Decl. ¶ 26; Goldmann Rep. 4, Hughes Decl., Ex. 2.) Indeed, as of February 11 and 21, CDC and WHO actively discouraged the public from wearing masks, which were reserved for health care providers, individuals with suspected or confirmed infections, and people in close contact with such individuals. (Goldmann Rep. 4, Hughes Decl., Ex. 2.) Nor did public health authorities discourage large gatherings: in February and even in March, people continued to pack into stadiums, concerts, classrooms, religious services, and airplanes without masks. (*Id.* at 4-5.) Nor did officials recommend testing of all passengers and crew, and indeed such universal testing would not have been possible given the unavaila-

bility of point-of-care tests. (*Id.* at 7; Tarling Decl. ¶ 28.) As of the voyages here, there were almost no confirmed COVID-19 cases in the United States and all had travel links to China. (Tarling Decl. ¶¶ 21-22.) There was no known community spread in North America until after *Grand Princess* departed. (*Id.*)

### B. Princess Implemented Screening Measures for *Grand Princess* Based on CDC and WHO Guidance

Plaintiff Susan Dorety and her husband Michael Dorety were passengers on *Grand Princess*, one of multiple ships owned and operated by Princess, for a cruise departing February 21, 2020. (SAC, ECF No. 42, ¶¶ 10-11.) *Grand Princess* sailed on back-to-back voyages departing San Francisco on February 11 and 21. (Nair Decl. ¶ 5.) Princess is an indirect subsidiary of Carnival Corporation, the parent of several operating cruise lines or "brands." (Haeflinger Decl. ¶ 3.) Carnival began monitoring COVID-19 following WHO reports from late December and early January. (*Id.* ¶ 6; Tarling Decl. ¶¶ 7-11.) Beginning January 23, Carnival issued Instructional Notices establishing policy to be adapted and implemented by each brand, including Princess, to implement CDC guidance and screen passengers for COVID-19 by asking about travel to China and certain flu-like symptoms. (Haeflinger Decl. ¶¶ 8-14 & Ex. 1; Tarling Decl. ¶ 25 & Ex. 8.)

Princess implemented this guidance for the February 11 and 21 voyages in multiple ways. (Tarling Decl. ¶¶ 25-35 & Ex. 9; Eaton Decl. ¶¶ 4-12.) First, Princess emailed passengers on both cruises that a new screening policy based on recent public health guidance would deny boarding and offer a full refund to any passenger traveling from or through mainland China, Macau, or Hong Kong. (O'Connor Decl. ¶¶ 2-6 & Exs. 1-2.) Passengers before the February 21 cruise were instructed that any false health reporting would result in immediate disembarkation at the next opportunity. (*Id.* Ex. 2.) Second, Princess checked passports of international passengers and crew to identify anyone who may have traveled from or through China, Hong Kong, or Macau in the previous 14 days. (Tarling Decl. ¶ 25; Eaton Decl.

¶¶ 9-10.) Third, passengers and crew were required to fill out a health screening form inquiring about travel to a prohibited region or contact with an infected person. (Eaton Decl. ¶¶ 4-5, 11-12 & Ex. 1 at 6) Princess employed this CDC-based guidance for screening individuals boarding the February 11 and 21 *Grand Princess* cruises. (*Id.* ¶ 12.) Before adopting and implementing this boarding denial policy, Princess determined that other cruise lines and air carriers were not using additional forms of screening. (Tarling Decl. ¶ 26.) Moreover, Princess implemented these policies even before CDC issued its February Interim Guidance for Ships. (*Id.*) Princess's approach was even more protective than CDC's and WHO's because it denied boarding to anyone with travel history to China as well as Hong Kong or Macau, *regardless of symptoms*. (*Id.*; Eaton Decl. ¶¶ 10, 12 & Ex. 1 at 5-6.) Based on existing CDC data at the time, the known risk for COVID-19 at ports on *Grand Princess*'s itinerary was low. (Tarling Decl. ¶ 23.) This data continued to support the geographic containment strategy for COVID-19 that CDC and other public health authorities adopted and Princess followed. (*Id.* ¶¶ 23-25.)

### C.     No COVID-19 Cases, or Suspect Cases, Were Detected on *Grand Princess*'s February 11 Voyage

During the February 11 cruise, several passengers and crew reported to medical staff with flu-like symptoms. (Nair Decl. ¶¶ 7, 10-11, 14-16.) These individuals did not have CDC's epidemiological link—travel to China or contact with a confirmed COVID-19 case—and therefore were not suspected cases. (*Id.*; Goldmann Rep. 9-10, Hughes Decl., Ex. 2.) Neither CDC nor other medical professionals treated flu-like symptoms alone as indicative of COVID-19—a person exhibiting those symptoms alone, for example, could not even obtain a COVID test. (Nair Decl. ¶ 11 & Ex. A at 2; Tarling Decl. ¶¶ 28-29; Goldmann Rep. 10, Hughes Decl., Ex. 2.)

As required by company policy and CDC regulations, *Grand Princess* medical staff tracked persons with influenza-like illness (ILI). (Tarling Decl. ¶¶ 27-29; Nair Decl. ¶¶ 4-13.) *Grand Princess*'s senior doctor, Dr. Nadia Nair, noted the

number of ILI cases was higher than normal, but did not meet the threshold for re-porting to CDC as an "outbreak." (Nair Decl. ¶ 7 & Ex. B at 2.) Princess nonethe-less strengthened sanitation procedures out of an abundance of caution. (*Id.* ¶¶ 7-8 & Ex. B at 1; Tarling Decl. ¶ 31.) Dr. Nair continued monitoring ILI cases; the num-bers declined and never met the outbreak threshold. (Nair Decl. ¶ 9.) Dr. Nair was aware of and concerned about COVID-19 and followed CDC guidance for identify-ing potential COVID-19 cases. (*Id.* ¶¶ 7-9.) Under these criteria, no one on the first voyage was a confirmed or suspect case. (*Id.* ¶¶ 7-16; Tarling Decl. ¶¶ 30-33.)

### D.   Princess Implemented CDC Guidelines for *Grand Princess*'s February 21 Cruise

Applying government guidance and Princess's corresponding screening poli-cies, Princess determined that no individual boarding the February 21 voyage met the criteria for a suspected case of COVID-19. (Tarling Decl. ¶¶ 34-36; Goldmann Rep. 10, Hughes Decl., Ex. 2.) At the time, the very small number of confirmed cas-es in North America had a required epidemiological link. (Tarling Decl. ¶¶ 17, 21 & Ex. 7 at 4.) The vast majority of confirmed cases worldwide were still in Asia. (*Id.* ¶ 17 & Ex. 7 at 1.)

Monitoring passengers and crew on the February 21 cruise, as required by CDC and company guidelines, *Grand Princess*'s medical staff determined that none met CDC criteria for suspect COVID-19 cases. (Nair Decl. ¶¶ 13-16; Tarling Decl. ¶¶ 34-36; Goldmann Rep. 9-10, Hughes Decl., Ex. 2.) On March 2, as *Grand Prin-cess* was sailing from Hawaii to Mexico, CDC notified Princess and *Grand Princess* medical staff about reports of a possibly infected passenger from the previous sail-ing who disembarked before the February 21 sailing. (Nair Decl. ¶¶ 17-18 & Ex. F at 3; Tarling Decl. ¶ 36 & Ex. 11 at 2-3.) Because the passenger did not develop symptoms until a week after disembarking, and based on the then-current under-standing of COVID-19's incubation period, it appeared likely that infection (if con-firmed) occurred after disembarkation. (Nair. Decl. ¶¶ 17-18; Tarling Decl. ¶ 36.)

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.                     2:20-CV-03507-RGK-SK

CDC advised that it was still working with local health authorities to find out missing information in order to assess the risk, if any, for *Grand Princess* and that no action was required. (Tarling Decl. ¶ 36.) Princess maintained constant contact with CDC. (*Id.*) Even as CDC worked to assess any risk to *Grand Princess*, Princess's epidemiologist directed medical staff to identify crew that may have served the passenger, screen them for respiratory symptoms and fever, monitor their condition for several days, and isolate them immediately if they had experienced respiratory symptoms in the last 14 days. (Nair Decl. ¶ 18 & Ex. F at 1.)

On March 3, CDC informed Princess that it had learned about a possible link between a different passenger on the February 11 cruise and COVID-19 cases in Northern California. (Nair Decl. ¶ 19; Tarling Decl. ¶ 37 & Ex. 12 at 1-2.) That day, Princess canceled the final port call and re-routed to San Francisco. (Tarling Decl. ¶ 38.) Early on March 4, Princess directed the passengers from the prior sailing to isolate in their cabins. (*Id.*; Capraro Decl. ¶ 4 & Ex. 1.) Princess notified the other passengers that CDC was investigating COVID-19 cases in Northern California connected to the first voyage, and instructed anyone with respiratory symptoms at any time during the voyage to contact the ship's medical center. (Capraro Decl. ¶ 6 & Ex. 2.) Crew were also notified about CDC's investigation, that the ship was raising its sanitation level, and that certain crew members were being isolated. (*Id.* ¶ 8 & Ex. 3; Tarling Decl. ¶ 38.) These notices, all sent early on March 4, were crafted based on input from CDC and at CDC's recommendation. (Nair Decl. ¶ 21 & Ex. G; Tarling Decl. ¶ 38 & Ex. 13 at 1, Ex. 15.) Princess implemented enhanced sanitation procedures and began to cancel large public gatherings. (Tarling Decl. ¶ 38.)

### E.   State and Federal Authorities Managed Disembarkation

California Governor Gavin Newsom declared a state of emergency on March 4, citing the rise of COVID-19 cases in California and explaining that "the number of persons requiring medical care may exceed locally available resources." (Request for Jud. Notice (RJN), Ex. 1.) On March 5, CDC advised Princess to isolate all pas-

sengers in their cabins, which Princess did. (Nair Decl. ¶ 22; Tarling Decl. ¶ 39 & Ex. 15 at 7, Ex. 16.) Shipboard medical staff began assisting CDC with testing passengers for COVID-19. (Nair Decl. ¶ 23 & Ex. H; Tarling Decl. ¶ 39.) On March 6, CDC informed Princess that 19 crew and 2 passengers were positive. (Nair Decl. ¶ 24; Tarling Decl. ¶ 40.) Government health authorities then took over in all meaningful respects to direct onboard disease response, and plan disembarkation and shoreside quarantine. (Taylor Decl. ¶¶ 5-13; Nair Decl. ¶¶ 21-26; Tarling Decl. ¶ 40.) On March 8, the U.S. Coast Guard (USCG) issued an order requiring *Grand Princess* to moor in Oakland by noon on March 9 and instructing that "[e]mbarkation and disembarkation operations are restricted, and will only be permitted as directed by federal health officials." (Taylor Decl. ¶ 8 & Ex. 3.) On March 9, as the Coast Guard directed, *Grand Princess* docked in Oakland. (Taylor Decl. ¶ 9.) That same day, CDC issued a "No Sail" Order specific to *Grand Princess*, which, among other restrictions, commanded that *Grand Princess* crew "observe health precautions as directed by HHS/CDC personnel" and "comply with all CDC and [Coast Guard] instructions to follow CDC recommendations for any public health investigations relating to passengers or crew as needed." (*Id.* ¶ 11 & Ex. 4.)

Disembarkation was managed by a "Unified Command," comprised of federal, state, and local government agencies, including CDC, USCG, and the California Department of Public Health (CDPH). (*Id.* ¶ 5.) The Command directed the docking of *Grand Princess* and implemented a phased passenger disembarkation process that—unlike a typical hours-long disembarkation—took place over several days. (*Id.* ¶¶ 5-13; *see* Nair Decl. ¶ 26.) The Command controlled the sequence of passenger disembarkation and whether passengers would go to healthcare facilities or government-managed quarantines. (Taylor Decl. ¶¶ 8, 10.)

In parallel with the general disembarkation process, CDPH instructed the ship's medical team to begin medically disembarking passengers who required immediate medical treatment for evaluation and treatment by CDPH. (Nair Decl. ¶ 29.)

Because of the number of individuals with respiratory symptoms and the need to prioritize disembarkation of passengers with the most pressing medical concerns, CDPH instructed Princess medical staff not to medically disembark all individuals who reported a fever and respiratory symptoms, without more. (*Id.* ¶ 30.) Instead, CDPH advised that only passengers who presented additional, serious symptoms— e.g., shortness of breath or chest pain—should be disembarked immediately. (*Id.*)

Because passengers were confined in their rooms, passengers were told to report illnesses by calling 911 for urgent medical care, or a non-emergency medical line for other issues. (*Id.* ¶ 31.) Princess officials staffing these lines reported to the medical center, which prioritized reports according to their severity. (*Id.*) For passengers reporting fever and respiratory symptoms without more, Princess sent a paramedic, who would take the passenger's vitals, provide medication, and instruct the passenger to call if symptoms worsened. (*Id.* ¶ 32.) Per CDPH's instructions, only passengers who reported symptoms beyond fever and mild respiratory symptoms— or who presented such symptoms when visited in their staterooms by paramedics— were immediately taken to the medical center and medically disembarked. (*Id.* ¶ 33.)

## F.    COVID-19 Becomes a Global Pandemic After Disembarkation

On March 11, 2020, WHO declared COVID-19 a pandemic. (Tarling Decl. ¶ 42.) On March 12, Princess announced a voluntary pause of operations (*id.* ¶ 41), and on March 14 CDC issued a No Sail Order prohibiting most cruise operations (85 Fed. Reg. 16,628). Yet, through mid-March, sports teams continued to pack stadiums with fans (Tarling Decl. ¶ 23), and there were many documented outbreaks in congregate settings ranging from restaurants to gyms to choir practices, some well into the summer (Jerome Rep. 11-12, Hughes Decl., Ex. 1; RJN, Ex. 2.) Even as of March 30, WHO recommended that people not wear masks unless they had COVID-19 or were caring for someone ill. (Jerome Rep. 12, Hughes Decl., Ex. 1.)

## LEGAL STANDARD

"Summary judgment is proper where no genuine issue of material fact exists

1   and the moving party is entitled to judgment as a matter of law." *Samuels v. Holland*

2   *Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011).

**ARGUMENT**

3

4   **I.     There Is No Evidence Establishing that Princess Had Actual or**

5           **Constructive Knowledge of a Risk-Creating Condition**

6           **A.     A Cruise-Ship Owner Must Have Actual or Constructive Notice of**

7                   **the Specific Risk-Creating Condition to be Liable for Negligence**

8           A cruise line "does not serve as an insurer to its passengers." *Archer v. Carni-*

9   *val Corp. & PLC*, 2020 WL 7314847, at *8 (C.D. Cal. Nov. 25, 2020) (quotation

10  marks omitted). Nor can a cruise line be held liable for the mere failure to *foresee*

11  harm. *Weiner v. Carnival Cruise Lines*, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22,

12  2012). Rather, "a carrier must have 'actual or constructive notice of the risk-creating

13  condition' before it can be held liable." *Samuels*, 656 F.3d at 953 (quoting *Keefe v.*

14  *Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). Thus, a cruise

15  line "must warn passengers only of those dangers that 'the cruise line knows or rea-

16  sonably should have known,' and 'which are not apparent and obvious to the pas-

17  senger.'" *Archer*, 2020 WL 7314847, at *8 (quoting *Weiner*, 2012 WL 5199604, at

18  *2). Courts in "cruise ship negligence case[s] routinely grant summary judgment in

19  a defendant's favor when a plaintiff fails to adduce evidence on the issue of notice."

20  *Tonelli v. NCL (Bahamas) Ltd.*, 428 F. Supp. 3d 1313, 1319 (S.D. Fla. 2019).[1]

21  _____

22  [1] Courts sometimes apply a different standard of care when "the condition
    constituting the basis of the plaintiff's claim" is "unique to the maritime context."

23  *Samuels*, 656 F.3d at 953. But even accidents involving passenger visits to beaches
    while a vessel is docked nearby are "not uniquely associated with maritime travel."

24  *Id*. Accordingly, this Court has applied the ordinary standard, requiring specific

25  knowledge of a risk-creating condition. *Archer*, 2020 WL 7314847, at *8. Other
    courts in this District have done the same: "the alleged risk-creating condition [here]

26  is not unique to the maritime context"; "the increased risk of exposure to COVID-19

27  occurs in any setting where individuals are in close proximity and engage in

28  prolonged interpersonal conduct," including, "for example, in nursing homes,

---

9

Knowledge—actual or constructive—must be proven at a specific level. Awareness of a *category* of harms that could injure passengers is insufficient. *Samuels*, 656 F.3d at 953-54. The carrier must have reason to know that the hazard was present at the place where the injury occurred. *Id.* In *Samuels*, the Ninth Circuit held that a shipowner was not required to warn a cruise passenger injured by a wave while visiting a beach "of the dangers of associated with swimming there." *Id.* at 949. Although everyone knows that swimming at beaches can lead to injury—*i.e.*, that waves can injure swimmers when waves are present—the plaintiff introduced no "evidence … that Holland American knew or should have known *that the Pacific Ocean side of Lover's Beach* was so dangerous that it needed to warn passengers not to swim there." *Id.* at 953-54 (emphasis added). There was not "a single [prior] report" that any passenger who visited that location that year had been injured. *Id.* at 954. The shipowner lacked "actual []or constructive notice" as a matter of law. *Id.*

*Samuels* accords with precedent holding that knowledge must be specific to the risk, the time period, and—key here—the location of injury. Shipowners without knowledge of dangers at a particular plaza where a passenger falls on uneven pavement cannot be liable for the fall, even if they know about the risks of pavement generally or even in the region. *Reming v. Holland Am. Line Inc.*, 662 F. App'x 507, 509-10 (9th Cir. 2016). Shipowners without specific knowledge of the danger that someone would trip over a screw on a particular stairway cannot be liable for a passenger tripping and falling, even if they know that a screw sticking up on a stairway, *if* present, could create a risk of tripping. *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 64-65 (2d Cir. 1988). Shipowners cannot be liable if they lack

_____

classrooms," and "public transportation." *Ford v. Carnival Corp.*, 2021 WL 3500959, at *3 (Aug. 9, 2021). Given the untold number of outbreaks in settings ranging from gyms to choir practices (Jerome Rep. 11-12, Hughes Decl., Ex. 1; RJN, Ex. 2), *and the global pandemic that ensued,* there is no evidence that the presence and spread of COVID-19 is unique to maritime travel.

knowledge of adverse weather near a ship's location at the time of an accident, *Kressly v. Oceania Cruises*, 718 F. App'x 870, 872 (11th Cir. 2017), or lack knowledge of a hazard at the particular location where the plaintiff slipped, *Francis v. MSC Cruises, S.A.*, 853 F. App'x 512, 516-17 (11th Cir. 2020).

These principles apply specifically in cases alleging exposure to diseases. This Court previously dismissed claims alleging that a COVID-19 outbreak on *Diamond Princess* in East Asia in early February gave Princess notice that COVID-19 was on *Grand Princess* when it sailed in the United States. *Saltzstine v. Princess Cruise Lines Ltd.*, 2020 WL 8475998, at *3 (C.D. Cal. Oct. 23, 2020) ("no reason for Defendant to believe that its passengers had been exposed to coronavirus prior to disembarking on February 21, 2020"). Other courts agree: The shipowner must have knowledge of an outbreak on the particular ship. *See Davis v. Cruise Operator, Inc.*, 2017 WL 3057610, at *4 (S.D. Fla. July 19, 2017); *Tonelli*, 428 F. Supp. 3d at 1320. In *Tonelli*, for example, the defendant concededly had notice that allowing young children in pools increased the risk of transmission of diseases through urine or feces, but there was "no evidence that Defendant was on notice as to the danger presented specifically by salmonella from children wearing diapers" or "that Defendant was on notice that salmonella was otherwise present on board the *Escape*," the ship where the plaintiff claimed to have been infected. 428 F. Supp. 3d at 1320. "Without such evidence," the plaintiff could not establish "the requisite notice." *Id.*

## B.   Princess Lacked Notice of Any Risk-Creating Conditions

Plaintiff asserts two theories of liability: (1) Princess was negligent in deciding to sail *Grand Princess* in light of COVID-19 (SAC ¶¶ 22-27); and (2) Princess was negligent in failing to adequately warn about or respond to the COVID-19 outbreak on board (*id.* ¶¶ 28-30). The supposed risk for both theories is the presence of COVID-19 aboard *Grand Princess* at the time Plaintiff sailed. Both theories fail.

### 1.   Princess Undisputedly Lacked Actual or Constructive Notice of the Presence of COVID-19 on *Grand Princess*

There is no evidence Princess had actual or constructive knowledge of COVID-19's presence on *Grand Princess*. The evidence is undisputed that on the February 11 and 21 voyages, Princess followed CDC guidance, which reflected a view that COVID-19 was largely confined to certain places in Asia. Carnival Corporation and plc relied on this guidance in promulgating directives for its brands to implement when screening passengers and crew. (*Supra* pp. 3-4; Haeflinger Decl. ¶¶ 8-14 & Ex. 1; Goldmann Rep. 7, Hughes Decl., Ex. 2.) CDC guidance on which Carnival relied was consistent with WHO and European authorities', and at the time was followed by clinicians worldwide. (Tarling Decl. ¶¶ 24, 28; Goldmann Rep. 7-9, Hughes Decl., Ex. 2.) Princess implemented these directives, warning passengers that boarding would be denied if they traveled from or through affected areas and that they would be subject to pre-boarding health screening. (O'Connor Decl. ¶¶ 2-6 & Exs. 1-2.) International passengers' passports were also screened for travel to prohibited regions in Asia and passengers and crew were screened for the same travel and relevant symptoms. (Tarling Decl. ¶ 25; Eaton Decl. ¶¶ 4-5, 9-12.) Princess's approach was more protective than guidance from CDC and WHO—it denied boarding to anyone with travel history to China, Hong Kong, or Macau, *regardless of symptoms*. (Tarling Decl. ¶ 26; Eaton Decl. ¶¶ 10, 12 & Ex. 1 at 5-6, Ex. 2 at 1.)

The evidence is undisputed that no passengers or crew met these uniform criteria, which were crafted by expert authorities for the specific purpose of detecting cases of COVID-19. (Tarling Decl. ¶¶ 30-36; Goldmann Rep. 9-10, Hughes Decl., Ex. 2.) That undisputed evidence squarely forecloses a finding of "actual … notice" that any individual aboard *Grand Princess* had COVID-19 when the vessel set sail on February 11 or 21. *Archer*, 2020 WL 7314847, at *8.[2]

---

[2] Although a passenger on February 20 (during the February 11 voyage) reported to the ship medical center with respiratory symptoms (but no fever), the passenger was not a suspected COVID case under applicable guidance because the passenger had no travel history to China or exposure to a suspected or confirmed case. (Nair Decl.

Nor could Plaintiff establish that Princess somehow had *constructive* knowledge of COVID's presence on *Grand Princess*. Constructive knowledge is what a person "reasonably should have known." *Archer*, 2020 WL 7314847, at *8 (quotation marks omitted). Again, the very point of CDC's guidance was to identify suspected cases of COVID-19 (Tarling Decl. ¶ 15 & Ex. 5), and Princess undisputedly complied with that guidance. Thus, finding constructive knowledge of COVID-19 aboard *Grand Princess* would require finding it *unreasonable* to adhere to CDC's screening procedures—or, worse, that the use of government-formulated screening mechanisms proves knowledge of the very disease being screened for. That perverse theory fails. Courts hold that without evidence of knowledge of a particular risk exceeding that of public health authorities, defendants cannot be charged with constructive knowledge exceeding that of the authorities. For example, in cases brought in the wake of discoveries about HIV and AIDS, courts frequently granted summary judgment against plaintiffs in cases alleging a duty to warn of the risk that HIV could be transmitted through blood because plaintiffs could not show a "medical consensus" at the time "that AIDS was transmissible by blood." *Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*, 927 F.2d 187, 194 (4th Cir. 1991). Courts so held even though industry participants had a generalized "increased concern that AIDS may be [so] transmitted" and knew about "potential risk" of transmission. *Id.* The rationale is straightforward: When public health officials, the medical community, and businesses alike are struggling to reach consensus about the nature and risks of an emerging disease, and are screening for the disease using the best available information, it is not just legally impermissible but manifestly unfair to impose liabil-

---

¶¶ 10-12 & Ex. C.) Likewise, a crewmember who disembarked in Hawaii on February 29 after reporting flu-like symptoms lacked the necessary epidemiological link and had infections that seemed to explain a number of observed symptoms, including fever. (*Id.* ¶ 15 & Exs. D, E.) The crewmember tested negative for COVID-19 after disembarkation. (*Id.* ¶ 16.)

ity based on "hindsight opinions" that these entities should have known more than government authorities or should have warned of all "possibl[e]" risks. *Id.*

The same principle forecloses relief here. Again, what matters is not whether Princess should have known about the *general presence* of COVID-19 in regions of the globe, or about COVID-19's potential risks *if* it found its way aboard a cruise ship. *Samuels*, 656 F.3d at 954. Plaintiff needs evidence supporting a conclusion that, despite the overwhelming public health consensus that COVID-19 was linked to a particular geographic region and that flu-like symptoms alone did not indicate a suspected case, Princess was required to ignore that consensus and to identify suspected cases of COVID-19 through other means. There is no such evidence.

### 2. Princess Provided Prompt Warnings to Passengers and Implemented All Measures Recommended by CDC

Plaintiff alleges that, once *Grand Princess* set sail, Princess failed to adequately notify passengers about the risk of COVID-19 aboard or to curtail its spread using unspecified protective measures. (SAC ¶¶ 28-30.) But the duties to warn and implement these measures require knowledge of the specific risk; there must be evidence that Princess knew or reasonably should have known that COVID was on the vessel at the time. *Samuels*, 656 F.3d at 953-54 (duty-to-warn liability requires proof of knowledge of specific risk). The evidence is that passengers and crew were monitored on board and *none* satisfied CDC criteria for a suspect case. (Nair Decl. ¶¶ 7-16; Tarling Decl. ¶¶ 30-36; Goldmann Rep. 10, Hughes Decl., Ex. 2.) And the evidence is undisputed that no guidance at the time recommended widespread mask-wearing, quarantining, or COVID-19 testing. (Tarling Decl. ¶ 26; Goldmann Rep. 4, Hughes Decl., Ex. 2.) Indeed, CDC and WHO discouraged the general public from wearing masks given their scarcity. (Goldmann Rep. 4, Hughes Decl., Ex. 2.) Once Princess suspected COVID-19 aboard, the undisputed facts are that Princess promptly—and with CDC's input—communicated what they knew to passengers, crew, and public health officials. (*Supra* pp. 5-6; Capraro Decl. ¶¶ 3-4, 6, 8 & Exs.

1-3; Tarling Decl. ¶ 38 & Exs. 13-15; Nair Decl. ¶ 21; O'Connor Decl. ¶ 9 & Ex. 3.) And Princess worked closely with CDC to mitigate risk and control the spread by implementing CDC-based protocols. (*Supra* p. 6; Tarling Decl. ¶¶ 38-39; Nair Decl. ¶¶ 22-23.) Plaintiff's real complaint is that Princess did not foresee COVID-19's presence, which even if true cannot support liability.

### 3.   None of Plaintiff's Evidence Establishes Notice

*Public health guidance.* No alert or guidance from public health authorities issued before the February 21 cruise establishes actual or constructive knowledge. (*See* Tarling Dep. 44:8-45:20, 130:6-13, Hughes Decl., Ex. 3.) These sources provided only general information about COVID but did not provide actual or constructive knowledge of the specific risk to *Grand Princess*. For example, the January 30 statement from the WHO Director-General declaring COVID-19 a "public health emergency of international concern" did "not recommend any travel or trade restriction based on the current information available" and highlighted that 99.9% of cases at the time had a direct link with China. (Tarling Decl. ¶ 14 & Ex. 4 at 2-3.) WHO's general determination that COVID-19 posed international risk did not give rise to specific notice that COVID-19 was likely present on *Grand Princess* half a world away. *Saltzstine*, 2020 WL 8475998, at *3 (outbreak in Asia "could not have indicated to Defendant the need to implement more stringent safety protocols on the *Grand Princess*"). Again, at best, this type of source suggests foreseeability.

*Individuals with flu-like symptoms.* Plaintiff theorizes that individuals exhibiting "symptoms of Coronavirus" on the prior *Grand Princess* sailing should have alerted Princess that COVID-19 was aboard the vessel on February 21. (SAC ¶¶ 22-23.) This Court could not have been clearer in rejecting this theory: "knowledge that some passengers had COVID-19 symptoms is insufficient for Defendant to have been on notice that the ship had been contaminated with COVID-19." *Saltzstine*, 2020 WL 8475998, at *3. There is no evidence that in February, during the midst of the annual flu season, Princess should have known that a person in the United States

exhibiting only flu-like symptoms likely had COVID-19, especially when CDC advised otherwise and would not even offer testing for such persons. (Tarling Decl. ¶¶ 28-29.) Holding otherwise would require holding the screening guidelines uniformly recommended by government authorities unreasonably lax—a theory courts consistently reject. *See McKee v. Cutter Lab'ys, Inc.*, 866 F.2d 219, 224 (6th Cir. 1989); *Miles Lab'ys*, 927 F.2d at 194.

For this reason, the two passengers who sailed on the February 11 sailing and were diagnosed with COVID-19 after disembarkation, and after the February 21 voyage was nearly complete, did not provide actual or constructive knowledge of COVID's presence when *Grand Princess* set sail on February 21. (SAC ¶ 23.) One of these passengers never reported symptoms during the sailing; Princess first learned he was a suspected case from CDC on March 2. (Nair Decl. ¶ 17.) The second passenger reported flu-like symptoms to shipboard doctors on February 20. But, lacking recent travel in China or contact with a known or suspected case of COVID-19, this passenger did *not* meet the criteria for a suspected case under CDC guidance. (Nair Decl. ¶¶ 10-12 & Ex. A at 1-2.) So too for the ill crewmember who disembarked on February 29 (SAC ¶ 29), who lacked CDC's necessary epidemiological link, had infections that seemed to explain observed symptoms, and ultimately tested negative for COVID on shore. (Nair Decl. ¶¶ 14-16 & Exs. D, E.)

***Princess's warnings.*** Plaintiff suggests Princess on February 25 issued a warning to passengers from the February 11 sailing but neglected to send that warning to passengers on the second sailing. (SAC ¶¶ 23, 29.) That allegation is simply untrue; Princess had no knowledge of any COVID cases related to *Grand Princess* at the time and, thus, sent no warning on February 25. (O'Connor Decl. ¶¶ 7-8.)

***Diamond Princess.*** Plaintiff relies on an outbreak on *Diamond Princess*, another vessel operated by Princess that had sailed in Asia. (SAC ¶¶ 8, 26.) That vessel departed from Yokohama, Japan on January 20 and disembarked a passenger on January 25 who tested positive for COVID-19 on February 1, leading to the vessel's

16

return on February 3 to Yokohama, where it was quarantined by the Japanese government. (Tarling Decl. ¶ 18.) "The fact that a different ship, in another country, had experienced an outbreak could not have indicated to Defendant the need to implement more stringent safety protocols on the *Grand Princess*." *Saltzstine*, 2020 WL 8475998, at *3. Again, this is consistent with the principle that courts assessing disease outbreaks on cruise ships must evaluate notice on a vessel-by-vessel basis. *Davis*, 2017 WL 3057610, at *4; *Tonelli*, 428 F. Supp. 3d at 1320. And it accords with the undisputed facts in this case: given the understanding of COVID-19 as region-specific, there was no reason to believe that an outbreak on a vessel across the globe would replicate in North America, when there were *zero* known cases lacking that key epidemiological link. (Tarling Decl. ¶¶ 18-21 & Ex. 7.)[3]

Even assuming *Diamond Princess* gave rise to notice regarding other vessels outside that geographic region, it is undisputed that the CDC and WHO had as much if not more knowledge as Princess about what transpired on the *Diamond Princess*. (Tarling Decl. ¶¶ 18-20.) Plaintiff concedes this, citing a February 18 CDC announcement of travel restrictions for passengers who had disembarked *Diamond Princess*. (SAC ¶ 8.) Yet these authorities did *not* advise vessels outside Asia to cease sailing, nor advise that passengers should be required to wear masks or social distance; rather, *Diamond Princess* reinforced the view that COVID-19 was limited geographically to China. (Tarling Decl. ¶ 18.) In fact, the final passengers were not

---

[3] Although "evidence of [past] accidents that are substantially similar" can sometimes support the existence of constructive knowledge, courts consistently demand a very high degree of similarity between the two incidents to create a factual dispute. *Taiariol*, 677 F. App'x at 601 (past incidents of falling on stairways not substantially similar to tripping on particular object that caused plaintiff's fall); *see Samuels*, 656 F.3d at 954 (no constructive knowledge because no history of accidents at location where plaintiff injured). Otherwise, liability could be imposed based on a "general foreseeability theory of liability that has been roundly rejected by federal courts because it would essentially convert a carrier into an insurer." *Navarro v. Carnival Corp.*, 2020 WL 1307185, at *4 (S.D. Fla. March 19, 2020).

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.                    2:20-CV-03507-RGK-SK

disembarked from *Diamond Princess* by Japanese authorities until February 22, the day after the start of *Grand Princess*'s voyage at issue here. (*Id.* ¶ 19.) But because the Japanese government managed the shipboard quarantine, Princess had very little information about its strategy and efficacy. (*Id.*) And discussions with the Japanese government and other public health authorities regarding *Diamond Princess* resulted in a limited and still-evolving understanding about COVID-19's transmission. (*Id.* ¶ 20.) Following *Diamond Princess*, Princess continued to implement policies based on WHO and CDC guidance, even exceeding that guidance by denying boarding to all individuals with any epidemiological risk factors even if they had no symptoms. (*Id.*) Princess cannot be liable for declining to do more than public health authorities that possessed as much or more information. *Miles Lab'ys*, 927 F.2d at 194.

*Information regarding risk of disease transmission on ships generally.* Unable to identify knowledge specific to *Grand Princess*, Plaintiffs rely on the notion that cruise ships generally are susceptible to disease outbreaks. (*E.g.*, Tarling Dep. 23:12-31:24, Hughes Decl., Ex. 3.) Generalized notice about what happens *if* diseases are present is insufficient as a matter of law because it has nothing to do with whether the particular disease *was* present. *See Tonelli*, 428 F. Supp. 3d at 1320; *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1993) (liability cannot be based on mere "creat[ion] or maintain[ance] [of] premises," without actual or constructive notice). CDC and other public health authorities knew about conditions on cruise ships and yet, even after *Diamond Princess*, did not recommend against sailing. Princess had no knowledge of a risk specific to *Grand Princess*.

### C. Even if Princess Had Notice of a Specific Risk-Creating Condition, Princess Undisputedly Was Not Negligent

Plaintiff also has no evidence that Princess failed to exercise "reasonable care under the circumstances." *Samuels*, 656 F.3d at 953.

1. Recognizing the unfairness of liability based on hindsight, courts in cases involving new infectious diseases consistently grant summary judgment when the

undisputed facts show that the defendant followed all government guidance applicable at the time. For example, many individuals who contracted HIV through blood transfusions during the early 1980s sued laboratories, blood banks, hospitals, and others alleging that these entities had negligently supplied blood infected with HIV. *See, e.g.*, *McKee*, 866 F.2d at 220; *Miles Lab'ys*, 927 F.2d at 194; *Zaccone v. Am. Red Cross*, 872 F. Supp. 457, 458 (N.D. Ohio 1994). Plaintiffs claimed that those entities should have used mechanisms that would have more reliably excluded HIV-positive blood like antibody tests or questioning about donors' sexual histories, *Zaccone*, 872 F. Supp. at 460-61, processed blood in ways that kill the virus, *McKee*, 866 F.2d at 224, or warned about the risk of transmission through blood, *Miles Lab'ys*, 927 F.2d at 194-95.

Courts routinely granted summary judgment for defendants on these claims. In *McKee*, for example, a plaintiff who was infected before "the medical community reached a consensus that AIDS could be transmitted by blood and that HIV was identified as the AIDS-causing virus" relied on expert testimony stating that, with existing technology, "Defendant *could have* heat treated or otherwise produced [blood] to inactivate the AIDS virus." *Id.* at 224. The Sixth Circuit found no triable issue of fact on that negligence claim. Notwithstanding "the tragic consequences," "hindsight opinions as to its possible prevention, before the disease-causing virus and the efficacy of preventive measures were discovered, are not sufficiently probative to preclude summary judgment." *Id.* The Fourth Circuit agreed: "Hindsight opinions by appellant's experts suggesting that more should have been done to prevent the transmission of what was then and now remains an enigmatic disease are insufficient …." *Miles Lab'ys*, 927 F.2d at 193.

The same principle applies here. *See* Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5:4 (6th ed. 2020) ("duly enacted laws, regulations, and rules" as well as "customs" are evidence of duty of care). Princess undisputedly adhered to government guidance in boarding passengers; screening for suspected cases; and re-

sponding to passengers' reporting of symptoms for a disease first discovered only two months earlier. Before implementing its boarding denial policy, Princess determined that others "in the industry," *Miles Lab'ys*, 927 F.3d at 193—cruise lines and air carriers—were not using additional forms of screening. (Tarling Decl. ¶ 26.) Once COVID-19 was suspected aboard, Princess re-routed to San Francisco and stayed in close communication with CDC as they worked to keep passengers safe until government authorities took over and directed disembarkation. Plaintiff's attempt to establish liability in the face of this undisputed evidence boils down to portrayal of copious government guidance as *itself* unreasonable, which they can only with the 20:20 vision of "hindsight." *Miles Lab'ys*, 927 F.2d at 193.

2. Plaintiff separately claims that Princess failed to "timely remove Michael Dorety from the ship" once he exhibited symptoms of COVID-19. (SAC ¶ 30.) But the undisputed facts establish that Princess exercised "reasonable care" in responding to Mrs. Dorety's reports of Mr. Dorety's symptoms, evaluating Mr. Dorety's condition, and, when his condition did not improve, promptly "sending [him] to a hospital with better medical care than the ship could provide." *Casorio v. Princess Cruise Lines, Ltd.*, 677 F. App'x 361, 362 (9th Cir. 2017). In particular, there is no dispute that in evaluating Mr. Dorety's condition and in disembarking him, Princess acted consistently with the instructions of government officials managing the complex process of disembarking passengers. Plus, there is no evidence that Mr. Dorety's disembarkation on March 10, rather than on March 9 when Mrs. Dorety first reported that he had a fever, caused his death ten days later on March 20.

Mrs. Dorety testified that she first contacted shipboard medical officials about her husband's condition on March 9, 2020. (Dorety Dep. 179:23-180:9, Hughes Decl., Ex. 4.) March 9 was the first day that *Grand Princess* was docked in Oakland; that day, public officials began working with Princess to disembark all passengers. (Taylor Decl. ¶¶ 8-13.) As this general disembarkation process began, CDPH officials instructed *Grand Princess* medical staff to begin medically disembarking

certain passengers. (Nair Decl. ¶ 29.) Because of the number of individuals with respiratory symptoms and the need to prioritize individuals with the most pressing medical concerns, state officials specifically instructed Princess *not* to medically disembark passengers presenting only fever and respiratory symptoms. (*Id.* ¶ 30.) Rather, Princess was directed to disembark only those passengers who exhibited symptoms more severe than a fever and mild respiratory symptoms. (*Id.*)

Princess followed CDPH's instructions. Mrs. Dorety describes calling medical staff twice on March 9 to report that Mr. Dorety had a fever, but did not describe reporting shortness of breath or other more serious symptoms warranting immediate disembarkation. (Dorety Dep. 196:4-199:7, Hughes Decl., Ex. 4.) The next morning, Mrs. Dorety called Princess's emergency line again and insisted that someone needed to come see Mr. Dorety. (*Id.* at 201:21-202:4.) By approximately 11:30am, Princess had dispatched a staff member to the Doretys' stateroom, who provided medication and told Mrs. Dorety to call medical staff if Mr. Dorety's condition did not improve. (*Id.* at 203:2-16.) Later that day, Mrs. Dorety called back to report that his condition had not improved; Princess medical staff then took Mr. Dorety to the ship's medical center, and then promptly disembarked him, at which point he was transported by ambulance to a nearby hospital. (*Id.* at 209:6-10, 217:5-225:7.) When Mr. Dorety arrived at the hospital on March 10, he was alert, oriented, and able to follow instructions and provide his medical history, he had normal blood oxygen levels, a cough and high respiratory rate but reported no shortness of brief, and was in guarded but not critical or morbid condition. (Kimura Dep. 19:7-20:8, 28:15-29:16, 33:24-37:18, 41:11-44:4 56:4-57:12, Hughes Decl. Ex. 5.) Mr. Dorety died ten days after being hospitalized. (Pls.' Initial Disclosures p.5, Hughes Decl., Ex. 6.)

Even if Princess's response could support liability under an ordinary standard of care—and it cannot—courts have refined the standard of care for shipowners facing emergency situations like the one here. "A ship is not a floating hospital." *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364, 1369 (5th Cir. 1988). It is sufficient for a

carrier "to send [a passenger] to a hospital with better medical care than the ship could provide." *Casorio*, 677 F. App'x at 362; *Leftow v. Princess Cruise Line, Ltd.*, 2018 WL 6133714, at *2 (C.D. Cal. Jan. 11, 2018). And shipowners facing "a situation of sufficient peril and immediacy" *cannot* be held liable for "ordinary … negligence." *Emps. Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 772 (5th Cir. 1989). "The master of a vessel caught in an emergency where he is forced to choose between risky alternatives, is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances." *Esso Std. Oil S.A. v. S.S. Gasbras Sul*, 387 F.2d 573, 580 (2d Cir. 1967). That is because "[t]he question of negligence must be resolved in light of the circumstances, and when faced with an emergency, negligence does not flow from mere errors in judgment." *M.P. Howlett, Inc. v. Tug Michael Moran*, 425 F.2d 619, 623 (2d Cir. 1970) (no negligence despite testimony that, in retrospect, the shipowner did not take "the proper course of action"). "[A] finding of negligence" in such circumstances could "only be based on hindsight." *Id.*

These principles foreclose liability. When *Grand Princess* docked on March 9, Princess faced an emergency situation that did not exist when it departed. Governor Newsom on March 4 had declared a state of emergency, recognizing the need to control the spread of COVID-19 lest the state's healthcare system be overwhelmed. (RJN, Ex. 1.) CDC on March 9 issued a No Sail Order restricting Princess's ability to disembark *Grand Princess* in the interest of preventing transmission of the disease. (Taylor Decl. ¶ 11 & Ex. 4.) The Unified Command effectively took over *Grand Princess* and implemented a staged process for disembarking passengers and crew that was unquestionably different from the ordinary process: Unlike the normal process, where all passengers would be disembarked within a few hours, health officials needed to select subsets of passengers for disembarkation day by day, in a process that was not completed for nearly a full week. (*Id.* ¶¶ 5-13.)

Reflecting the need to balance rapid disembarkation with the limited re-

1   sources of public health agencies, medical professionals, and shoreside facilities,

2   CDPH officials instructed Princess not to medically disembark passengers exhibit-

3   ing only fever and respiratory symptoms. (Nair Decl. ¶ 30.) And Mrs. Dorety on

4   March 9 describes reporting only the sorts of symptoms that public officials had in-

5   structed did *not* warrant disembarkation. (*Supra* p. 21.) Once she reported that Mr.

6   Dorety's condition had not improved on March 10, Princess dispatched a medical

7   official to the Doretys' stateroom, where he was evaluated and disembarked within

8   hours. (*Id.*) Princess's response to these reports of symptoms—and disembarkation

9   of Mr. Dorety within a day of his fever being reported—fell within the "wide range

10  of discretion" that courts allow during emergencies. *Esso Std. Oil*, 387 F.2d at 580.

11       Finally, there is no evidence that any delay in Mr. Dorety's disembarkation

12  caused his death. "Expert testimony is required to establish medical causation"

13  where, as here, the condition is "not readily observable or susceptible to evaluation

14  by lay persons." *Mann v. Carnival Corp.*, 385 F. Supp. 3d 1278, 1285 (S.D. Fla.

15  2019); *see Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009)

16  (expert testimony required to prove that chemical exposure on ship caused injuries);

17  *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1133-39 (D. Or. 2002)

18  (summary judgment where plaintiffs failed to present admissible expert evidence

19  that they suffered from alleged injury). The only expert Plaintiff offers on this issue,

20  Dr. Barry Fox, stops short of offering an opinion on causation. (Fox Rep. ¶ 3,

21  Hughes Decl., Ex. 7.) Rather, Dr. Fox states only that Mr. Dorety "should have got-

22  ten earlier medical attention between March 4th and March 9th" but admits that he

23  "cannot guarantee" that Mr. Dorety "would have ***survived*** his COVID-19 illness"

24  had he received treatment sooner. (*Id.* (emphasis in original).) Thus, there is no evi-

25  dence Mr. Dorety would have experienced a different outcome if he had been evac-

26  uated on March 9, when Mrs. Dorety first called to report he had a fever, as opposed

27  to March 10, when he was evaluated, disembarked, and taken to the hospital.

28       **D.    Plaintiff's Theory Would Upend Maritime Commerce and More**

1   The implications of Plaintiff's arguments reinforce the principles of maritime
2   law, and common sense, that support judgment. "[T]he protection of maritime
3   commerce" is a "fundamental interest" of federal maritime jurisdiction and has cau-
4   tioned against expansions of liability that "frustrate" this protective purpose. *The*
5   *Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2287 (2019) (quotation marks omitted).
6   Plaintiff's theory would extend liability to any shipowner that operates in the face of
7   *any* risk, no matter how slight and even if there is no evidence the shipowner knew
8   that the risk was actually present on a particular ship. In a world with new diseases
9   and variants, it would be impossible for businesses to operate without facing crip-
10   pling liability for failing to predict outbreaks. The consequences would not be con-
11   fined to novel diseases: Under Plaintiff's view, businesses must close in response to
12   every theoretical danger customers might face, even without information that the
13   danger threatens that particular business. Businesses that do not simply shut down
14   will have to issue "barrage[s]" of warnings about all the ways in which someone
15   could "possibly" be injured. *Miles Lab'ys*, 927 F.2d at 194. And under Plaintiff's
16   theory that that Princess should have responded differently to Mr. Dorety's condi-
17   tion, the rapid decisions that shipowners make in emergencies will be scrutinized
18   with the 20:20 vision of hindsight, with purported missteps leading to massive lia-
19   bility. Maritime law, and common sense, foreclose this outcome.

20   **II. Plaintiff Seeks Two Categories of Damages that are Unavailable**

21   A.  Plaintiff may not recover "damages for Mr. Dorety's conscious pain and
22   suffering and pain and mental anguish" before his death. (Pls.' Initial Disclosures
23   p.7, Hughes Decl., Ex. 6.) Even if Plaintiff were correct that California law, rather
24   than the Death on the High Seas Act (DOHSA), governs her claims (*see* SAC ¶ 21),
25   California law makes clear that a surviving plaintiff *cannot* recover for the dece-
26   dent's pre-death pain and suffering. Cal. Code Civ. Proc. § 377.34 (recoverable
27   damages "do not include damages for pain, suffering, or disfigurement"); *see, e.g.*,
28   *Garcia v. Whitehead*, 961 F. Supp. 230, 232 (C.D. Cal. 1997) ("California's survi-

24

1  vorship statute … specifically excludes damages for a decedent's pain and suffer-

2  ing"); *Garcia v. Superior Ct.*, 42 Cal. App. 4th 177, 186-88 (1996).[4]

3      B.  Punitive damages are also foreclosed as a matter of law, for two reasons.

4  *First*, punitive damages are categorically unavailable. There is no history in mari-

5  time law of awarding punitive damages where, as here, the defendant's conduct is

6  no more than a failure to anticipate harm from a novel disease after following public

7  health advice or even a delay in medically evacuating a passenger in emergency

8  conditions. *Batterton*, 139 S. Ct. at 2278. The small number of maritime cases

9  awarding passengers such damages involved intentional if not criminal conduct. *See*,

10  *e.g.*, *Chamberlain v. Chandler*, 5 F. Cas. 413 (C.C.D. Mass. 1823) (Story, J.) (per-

11  mitting damages to "punish" shipowner where master's conduct to female passenger

12  included "habitual obscenity, harsh threats, and immodest conduct"); *McGuire v.*

13  *The Golden Gate*, 16 F. Cas. 141 (C.C.N.D. Cal. 1856) (ship's master transported

14  passenger against his will to Hawaii at behest of vigilante group). Nothing in Prin-

15  cess's conduct comes close. *Second*, because Princess followed current public health

16  advice in screening for COVID-19 at the time of sailing and in responding to the

17  disease once likely cases were discovered on board, there is no evidence that Prin-

18  cess's conduct "demonstrates a reckless or callous disregard for the rights of others"

19  or "shows gross negligence or actual malice or criminal indifference." *Archer*, 2020

20  WL 7314847, at *9 (quotation marks omitted).

### CONCLUSION

22      The Court should grant judgment in favor of Princess.

---

[4] If Mr. Dorety contracted COVID-19 over three nautical miles from U.S. shore, Plaintiff's sole claim is under the DOHSA, which limits damages to "pecuniary loss sustained by the individuals for whose benefit the action is brought." 46 U.S.C. § 30303. DOHSA, like California law, forecloses recovery for pre-death pain and suffering. *Dooley v. Korean Air Lines Co.*, 524 U.S. 116, 123 (1998). For purposes of this motion, Princess assumes DOHSA does not govern Plaintiff's claim, given the apparent factual dispute about the location of the decedent's contraction.

1  DATED: August 16, 2021          ARNOLD & PORTER
2                                  KAYE SCHOLER LLP

3                             By: *s/ Jonathan W. Hughes*
4                                  Jonathan W. Hughes (SBN: 186829)
                                   Three Embarcadero Center, 10th Floor
5                                  San Francisco, CA 94111
                                   Tel.:  (415) 471-3100
6                                  Fax:   (415) 471-3400

7
8                                  Angel Tang Nakamura (SBN: 205396)
                                   angel.nakamura@arnoldporter.com
9                                  777 South Figueroa Street, 44th Floor
                                   Los Angeles, CA 90017
10                                 Tel.:  (213) 243-4000
11                                 Fax:   (213) 243-5999

12                                 Christopher M. Odell
13                                 christopher.odell@arnoldporter.com
                                   Amanda S. Thompson
14                                 amanda.thompson@arnoldporter.com
15                                 700 Louisiana St., Suite 4000
                                   Houston, TX 77002
16                                 Tel.:  (713) 576-2400
17                                 Fax:   (713) 576-2499

18                                 (continued on next page)
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MALTZMAN & PARTNERS, PA

*s/ Jeffrey B. Maltzman*
Jeffrey B. Maltzman (SBN: 131758)
Rafaela P. Castells (SBN: 290828)
Edgar R. Nield (SBN: 135018)
Gabrielle De Santis Nield (SBN: 110930)
681 Encinitas Blvd., Suite 315
Encinitas, CA 92024
Tel.:   (760) 942-9880
Fax:   (760) 942-9882
jeffreym@maltzmanpartners.com
edn@maltzmanpartners.com
gabn@maltzmanpartners.com
rafaelac@maltzmanpartners.com

*Attorneys for Defendant*
*Princess Cruise Lines, Ltd.*