Gerald Singleton (SBN 208783)
J. Ross Peabody (SBN 98190)
Singleton Law Firm APC,
857 E. Main Street
Ventura, California 93001
Tel: (619) 771-3473
Fax: (619) 255-1515
Gerald@SLFfirm.com
Ross @SLFfirm.com

Rusty Hardin
*Admitted Pro Hac Vice*
TX State Bar No. 08972800
Ryan Higgins
*Admitted Pro Hac Vice*
TX State Bar No. 24007362
Daniel Dutko
*Admitted Pro Hac Vice*
TX Bar No. 24054206
Leah M. Graham
*Admitted Pro Hac Vice*
TX Bar No. 24073454
Rusty Hardin & Associates, LLP
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800
rhardin@rustyhardin.com
rhiggins@rustyhardin.com
ddutko@rustyhardin.com
lgraham@rustyhardin.com

## UNITED STATES DISTRICT OF CALIFORNIA
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN DORETY INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MICHAEL DORETY. <br><br> Plaintiff, <br><br> v. <br><br> PRINCESS CRUISE LINES LTD., <br><br> Defendant. | **Case No. 2:20-cv-03507-RGK-SK** <br><br> **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> **Judge: Hon. R. Gary Klausner** <br> **Magistrate:  Hon. Steve Kim** <br><br> **Date: September 13, 2021** <br> **Time: 9:00 a.m.** <br> **Judge: Hon. R. Gary Klausner** <br> **Courtroom: 850** |

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION…………………………………………………..………1

II.  BACKGROUND……………………………………………………..……1

A.  Defendant knew the danger of virus spread on
the *Grand Princess*…………………………………………………………1

    1.  Public Health Guidance……………………………..…..………………2

    2.  The COVID-19 Outbreak on the *Diamond Princess*…………………4

    3.  On February 11, 2020 the *Grand Princess* sets
sail for Mexico………………………………………………..…………6

    4.  Defendant failed to meet its own safety standards……………………7

B.  Defendant's Response to Risk of COVI-19 Outbreak
on the *Grand Princess* …………………………………………………8

III.  ARGUMENT………………………………………………..……… . 12

A.  Genuine Disputes of Material Fact Exist as to Defendant's
Negligence……………………………………………………………12

    1.  Defendant had a heightened duty of care to protect
Passengers on the *Grand Princess* from the risks of
Communicable Diseases…………………………………….…………12

    2.  Genuine disputes of material fact exist as to whether and
When Defendant had actual or constructive knowledge of
the risk of a COVID-19 outbreak about the *Grand Princess*…………15

B.  Genuine Issues of Material Fact Exist as to Whether Defendant
Breached its Duty of Care………………………………………………..18

C.  There are Genuine Issues of Material Fact as to Whether
Defendant's Conduct was "Extreme and Outrageous"……………………..21

IV.    CONCLUSION……………………………………..…………………23

# TABLE OF AUTHORITIES

**CASES:**

*Bartlett v. Mutual Pharmaceutical Co.*,
760 F. Supp.2d 220, 249 (D.N.H. 2011)……………………………………………..21

*Beard v. Norwegian Caribbean Lines*,
900 F.2d 71, 73 (6th Cir. 1990)……………………………………………………12

*Birkenholz v. Princess Cruise Lines, Ltd.*,
No. 2:20-cv-03167- DSF-JC (C.D. Cal. Aug. 21, 2020), slip op. at 10……………23

*Catalina Cruises v. Luna*,
137 F.3d 1422, 1425–26 (9th Cir. 1998)…………………………………...13, 14

*Churchill v. F/V Fjord*,
892 F.2d 763, 772 (9th Cir. 1988)…………………………………………………22

*Complaint of Metcalf*,
530 F.Supp. 446, 459 (S.D.Tex 1981)……………………………………………22

*Deck v. Am. Hawaii Cruises, Inc.*,
51 F. Supp. 2d 1057, 1061 (D. Haw. 1999)………………………………………1

*Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*,
927 F.2d 187, 191 (4th Cir. 1991)…………………………………………………19

*Exxon Shipping Co. v. Baker*,
554 U.S. 471, 493 (2008)…………………………………………………………22

*Favaloro v. S/S Golden Gate*,
687 F.Supp. 475, 480 (N.D.Cal. 1987)……………………………………………22

*Galentine v. Holland America Line-Westours, Inc.*,
333 F. Supp. 2d 991, 995-96 (W.D. Wash. 2004)………………………………13

*Grand Trunk Railway Co. of Canada v. Ives*,
144 U.S. 408 (1892)………………………………………………………………20

*In re Air Crash Off Point Mugu, California*,
145 F.Supp.2d 1156, 1166 (N.D.Cal. 2001)…………………………………………22

*Isbell v. Carnival Corp.*,
462 F.Supp.2d 1232, 1237 (S.D. Fla. 2006)………………………………………15

*Kearns v. Celebrity Cruises, Inc.*,
No. 95 Civ. 4004 CSH, 1997 WL 729108, at *2 (S.D.N.Y. 1997)……………13, 14

*Keefe v.Bahama Cruise Line, Inc.*,
867 F.2d 1318, 1322 (11th Cir. 1989)……………………………………………12

*Kermarec v. Compagnie Generale Transatlantique*,
358 U.S. 625, 632 (1959)…………………………………………………………12

*Kirk v. Holland American Line*,
616 F. Supp.2d 1101, 1105 (W.D. Wash. 2007)…………………………………13

*Lobegeiger v. CelebrityCruises, Inc.*,
No. 11-21620-CIV, 2011 WL 3703329 at *7 (S.D. Fla. 2011)……………………23

*Martinez de Jesus v. P.R. Elec. Power Auth.*,
256 F. Supp. 2d 122, 126-27 (D.P.R. 2003)………………………………………21

*McKee v. Cutter Lab'ys, Inc.*,
866 F.2d 219, 224 (6th Cir. 1989)…………………………………………………19

*Noon v. Carnival Corp.*,
No. 18-23181- CIV, 2019 WL 3886517,
at *13 (S.D. Fla. Aug. 12, 2019)………………………………………………22-23

*Samuels v. Holland America Line–USA Inc.*,
656 F.3d 948, 953 (9th Cir. 2011) (quoting *Rainey*, 709 F.2d at 172)……………12

*Schoenfeldt v. Schoenfeldt*,
No. C13-5468 RJB, 2014 WL 1910808,
at *3 (W.D. Wash. May 13, 2014)………………………………………………13, 14

*Simmons v. Ware*,
213 Cal. App. 4th 1035, 1046, 153 Cal. Rptr. 3d 178, 187–88 (2013)……………21

*The Dutra Grp. v. Batterton*,
139 S. Ct. 2275, 2278(2019)…………………………………………………………22

*Tufariello v. Long Island R.R. Co.*,
458 F.3d 80, 91 (2d Cir. 2006)…………………………………………………….20

*Yamaha Motor Corporation v. Calhoun*,
(996) 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578…………………………..21-22

**Other Authorities:**

Restatement (Second) of Torts § 288C (1965)…………………………………….20

Restatement (Third) of Torts:
Liability for Physical and Emotional Harm § 16 (2010)…………………………...20

COMES NOW, Plaintiff Susan Dorety Individually and on behalf of the Estate of Michael Dorety, and files this Response in Opposition to Defendant's Motion for Summary Judgment.  Plaintiff shows the Court as follows:

# I.      INTRODUCTION

Defendant knew the increased risk of communicable disease transmission aboard cruise ships, the warnings from governmental and non-governmental international public health experts related to the global outbreak of COVID-19, the ongoing COVID-19 outbreak aboard its sister ship, and its lack of capacity to address these issues. Yet, Defendant chose to negligently put the lives of all *Grand Princess* passengers, including Michael Dorety, at risk of contracting COVID-19.

# II.     BACKGROUND

## A.      Defendant knew the danger of virus spread on the *Grand Princess*

Cruise ships are "a unique mode of transportation. Cruise ships are self-contained floating communities." *Deck v. Am. Hawaii Cruises, Inc.*, 51 F. Supp. 2d 1057, 1061 (D. Haw. 1999).  This includes the dynamics of passenger-to-crew, crew-to-passenger, and crew-to-crew intermingling in a semi-closed setting resulting in high transmission rates. (Declaration of Leah M. Graham (Graham Decl.), Ex. 46 at 25:04-18). Defendant's Senior Vice President and Chief Medical Officer, Dr. Grant Tarling, admits that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships . . . *increase the risk of communicable disease*

*transmission*" and "represent a potential source for introduction of novel or antigenically drifted influenza strains" (Graham Decl., Ex. 26; Ex. 46 at 23:04-23:09) (emphasis added). The CDC has also warned that "ships may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces," because travel by cruise ship "involves the movement of large numbers of people in closed and semi-closed environments." (Graham Decl., Ex. 17).

## 1.    Public Health Guidance

On January 9, 2020, the World Health Organization ("WHO") announced that Chinese health authorities determined that the pneumonia-like illness first detected in Wuhan was caused by a new strain of coronavirus, SARS-CoV-2, or COVID-19. (Graham Decl., Ex. 47).   On January 21, the CDC confirmed the first case of COVID-19 in the U.S. (Graham Decl., Ex. 29). On January 23, the WHO assessed the risk of a COVID-19 outbreak to be "high at the global level." (Graham Decl., Ex. 19). On January 26, the CDC confirmed five cases of COVID-19 in the U.S. with two of those cases in Orange County, California (Graham Decl., Ex. 48).  That same day, Dr. Grant Tarling warned that "the situation is worsening and new scientific modelling suggests the case number could reach over 200,000 within weeks." (Graham Decl., Ex. 51).  He indicated that "[t]ransmissibility is increasing. The outbreak has come to a severe and complicated situation." *Id.* Defendant knew

**Plaintiff's Memorandum In Opposition**                    2:20-CV-03507-RGK-SK
**To Defendant's Motion for Summary Judgment**

that (1) "the illness is communicable prior to symptom onset," and (2) "travelling groups may have spread the illness among them not had illness within the 3 days" before boarding the ship. *Id.* Defendant urged the Group to quickly describe its responses to the outbreak to various National Health authorities to avoid "implement[ation] of more stringent measures and investigations of our ships." *Id.*

On January 27, Dr. Tarling summarized key aspects of COVID-19 for Defendant's executives, explaining that COVID-19 (1) was spread person-to-person "through droplets, close contact and fomites"; (2) was more communicable than SARS; (3) could be spread person-to-person before symptoms develop; (4) could be spread by each infected person to 2.6 people, but some infected persons have infected up to 13 people; (5) incubation period is 1-14 days, with a mean time to illness of 10 days; and (6) can be lethal. (Graham Decl., Ex. 1).

On January 30, the CDC confirmed person-to-person spread in the U.S. (Graham Decl., Ex. 46 at 44:08-16; 44:24-45:14). That day, the WHO declared the "outbreak of Covid-19 constitutes a Public Health Emergency of International Concern." (Graham Decl., Ex. 46 at 53:20-54:03; Ex. 21). On January 31, the U.S. Secretary for Health and Human Services declared COVID-19 a "public health emergency" for "the entire United States" exists "and has existed since January 27, 2020, nationwide." (Graham Decl., Ex. 46 at 54:4-12; Ex. 15).

Plaintiff's Memorandum In Opposition                    2:20-CV-03507-RGK-SK
To Defendant's Motion for Summary Judgment

On February 2, Dr. Tarling, shares the following information with Defendant's executives: "strong new evidence of asymptomatic spread, that illness will most likely become pandemic as did H1N1…It's very, very transmittable, and it almost certainly is going to be a pandemic." (Graham Decl., Ex. 46 at 121:23-122:08).

On February 14, the CDC declared COVID-19 was an "unprecedented public health threat," and that preparations must be made for "sustained community spread … in the US." (Graham Decl., Ex. 23).

On February 21, the day the *Grand Princess* set sail, the WHO reported 76,769 confirmed COVID-19 cases globally, with 1,021 new cases identified in the previous 24 hours. The WHO listed its global risk assessment for COVID-19 as "high," with 1,200 confirmed cases outside of China. (Graham Decl., Ex. 46 at 54:23-55:13; Ex. 32).

### 2. The COVID-19 Outbreak on the *Diamond Princess*

By February 1, Defendant knew of an outbreak of COVID-19 aboard it's cruise ship, the *Diamond Princess*, when a passenger who had disembarked in Hong Kong days earlier tested positive for COVID-19. (Graham Decl., Ex. 22 at 3.9). On February 2, Defendant sent a media statement confirming the first confirmed COVID-19 case amongst a passenger aboard the *Diamond Princess*, who was by then hospitalized. (Graham Decl., Ex. 49). On February 5, 10 cases of COVID-19

- 4 -

were confirmed aboard the *Diamond Princess*. By February 10, that number had risen to 135. (Graham Decl., Ex. 21 at 3.10). As of February 10, Defendant's ability to maintain quarantine aboard the *Diamond Princess* was deteriorating and challenging. (Graham Decl., Ex. 33).  "[D]espite quarantine and isolation efforts," more than 700 people aboard the *Diamond Princess* would contract the virus in the three weeks following identification of the first COVID-19 case in a person who was symptomatic before leaving the ship." (Graham Decl., Ex. 46 at 32:2-10). "[T]he outbreak of Covid-19 onboard the *Diamond Princess* demonstrates the speed and extent of disease transmission that can occur onboard cruise ships." (Graham Decl., Ex. 46 at 31:19-24). For weeks, the *Diamond Princess* was the site of the largest outbreak of COVID-19 outside of China. *Id*.

On February 18, in response to *Diamond Princess* crisis, the CDC advised that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk." (Graham Decl., Ex.34). At least two passengers aboard the *Diamond Princess* died before the *Grand Princess* set sail on February 21. (Graham Decl., Ex. 21 at 3.11).

As a result of the *Diamond Princess* catastrophe, Defendant acknowledged that it  "actually had insight into the global situation [about COVID-19] much earlier than most." (Graham Decl., Ex. 21 at 3.1).

**Plaintiff's Memorandum In Opposition**          2:20-CV-03507-RGK-SK
**To Defendant's Motion for Summary Judgment**

### 3.   On February 11, the *Grand Princess* sets sail for Mexico

On February 11, Defendant operated a round-trip voyage on the *Grand Princess* from San Francisco to Mexico. During that voyage, an 85-year-old passenger died onboard from a respiratory illness after coughing and sneezing for four days. (Graham Decl., Ex. 35). Nine crew members had to be medically disembarked for "symptoms suggestive of acute respiratory disease." (Graham Decl., Ex. 36-37). The ship's doctor reported "concerning" levels of "Influenza-like illness" ("ILI") aboard the ship. (Graham Decl., Ex. 38). By the end of voyage to Mexico, 22 passengers or crew members had reported ILIs. 12 of these individuals were tested for influenza; all 12 tested negative. (Graham Decl.,Ex. 39). These negative influenza tests should have caused Defendant concerns about the potential for COVID-19 cases among those who presented with ILI on that trip.

Even with the above knowledge Defendants failed to take basic precautions. They failed to test for COVID-19; they failed to require passengers and crew who showed ILI signs to quarantine for 14 days; they failed to perform health screening for passengers remaining on board the vessel for the subsequent voyage to Hawaii; they failed to conduct thermal screening of passengers, despite knowing elevated temperature was a sign of COVID-19; they failed to encourage social distancing among passengers and crew; and they refused crew members' requests to wear

masks. (Graham Decl., Ex. 46 at 86:05-09; 86:02-04; 82:16-83:0286:10-16; 86:17-87:04; 102:04-16; 113:05-10; 129:07-18)

### 4. Defendant failed to meet its own safety standards

Defendant was at an informational advantage as to how COVID-19 impacts passengers and crew on a cruise ship. Dr. Grant Tarling testified:

> **Princess had information that passengers didn't have**—that's the same as all people around the world.  We have access to health officials that passengers and crew don't have.

(Graham Decl., Ex. 46 at 72:04-15) (emphasis added).

Defendant holds itself to a higher standard—a standard it did not meet in this instance:

> [W]e follow the advice of the best scientific minds in the world, whether the CDC, WHO, et cetera, and we try and implement and put into place all those policies and procedures that they are recommending. Not only requiring, but other guidance and recommendations as well.

(Graham Decl., Ex. 46 at 74:21-75:10).

Prior to February 21 when the *Grand Princess* set sail, Defendant was aware of various governmental warnings, its own experience with the *Diamond Princess*, and its unique knowledge into the transmissibility and serious health risks of COVID-19. Yet, as shown below, there are fact questions as to whether Defendant acted negligently in setting sail in the manner that it did.

**B.     Defendant's Response to Risk of COVID-19 Outbreak on *Grand Princess***

Despite a global health emergency, Defendant's medical "subject matter experts" repeatedly focused on Defendant's financial bottom line instead of passenger safety. Dr. Tarling worried that the COVID-19 emergency "will panic many who want to travel." (Graham Decl., Ex. 65).

In response to financial concerns, Defendant sought to mislead the cruise-going public into believing "the risk to cruise ship travelers in very low." (Graham Decl., Ex. 31). Defendant knew the risk was not low.[1] To entice passengers to continue purchasing cruise trips, Defendant announced it would introduce "pre-boarding health reporting" for passengers, as well as additional screening for passengers from "affected areas." (Graham Decl., Ex. 31). Defendant knew that pre-boarding screening had limited effectiveness in identifying infected, or potentially infected, individuals. On February 20, European Union Healthy Gateways released interim advice on COVID-19, acknowledging the limitations of pre-boarding screening, including potentially false declarations by passengers about exposure and disease, signs, and symptoms and drugs that can be used to reduce fever, and noting that screening measures failed to confirm cases during outbreaks of SARS and H1N1 (Graham Decl., Ex. 50).

Defendant refused requests for full refunds or future-cruise credit to those

---

[1] *See* §I.A., *supra*.

passengers who were concerned about the risk of contracting COVID-19 prior to boarding the February 21 *Grand Princess* voyage. (Graham Decl., Ex. 52). Defendant also refused requests for full refunds or future cruise credit to those *Grand Princess* passengers who were concerned that they had been in close contact with individuals from mainland China. (Graham Decl., Ex. 53).

Defendant repeatedly relies upon WHO and CDC guidance indicating that individuals should be suspected of having COVID-19 if they exhibited both symptoms of fever and lower respiratory illness *plus* an epidemiological link from travel to China or close contact with a person known to have COVID-19. But these criteria were inclusive, *not* exclusive. The same guidance made clear: evaluation must be done on a "case-by-case basis" and a person presenting with fever and respiratory symptoms with an "unexpected clinical course" or "uncertain exposure" should be considered "under investigation" for COVID-19 even in the absence of an epidemiological link to China or to a person suspected of being infected. (Graham Decl., Ex. 16). Defendant omitted this important caveat in its fleetwide medical guidance on COVID-19. (Graham Decl., Ex. 5; Ex. 6).

On February 21, the *Grand Princess* departed from San Francisco to Hawaii with 3,533 people onboard, including 2,422 guests and 1,111 crew representing 54 nationalities, including dozens of passengers and over 1,000 crew members from the prior voyage, some of whom were exhibiting ILIs. (Graham Decl., Ex. 21 at 3.15-

**Plaintiff's Memorandum In Opposition**          **2:20-CV-03507-RGK-SK**
**To Defendant's Motion for Summary Judgment**

16). Defendant set sail with only seven medical personnel on board. (Graham Decl. Ex. 56 at 43:21-25).

Defendant continued to hold large public gatherings, events, and activities. Four days into the voyage, there were already 11 documented cases of ILI, including four cases reported on February 25 alone. (Graham Decl., Ex. 66). On February 28, while on the island of Maui, Defendant arranged for passengers to disembark the ship via an enclosed tender boat with a capacity of 155. (Graham Decl. Ex. 60). Defendant crammed that tender boat to maximum capacity, forcing passengers, such as Michael and Susan Dorety, to sit elbow-to-elbow with other passengers and crew who had previously visited the medical center with ILI symptoms and subsequently tested positive for COVID-19. (Graham Decl., Ex. 61, Dr. Fox Report, Ex. 62 at 116:8-25; 119:2-11; 119:12-120:25)

On March 2, Defendant learned of the possible infection of a passenger on the immediate prior voyage to Mexico. (Graham Decl., Ex. 47).  On March 3, Defendant learned of a suspected link between a different *Grand Princess* passenger and COVID-19 cases in Northern California. (Graham Decl., Ex. 25, Ex. 67). On March 4, Defendant learned that the CDC was investigating a cluster of COVID-19 cases in Northern California connected to the prior *Grand Princess* voyage. (Graham Decl., Ex. 25). Only then did Defendant implement *partial* quarantine measures onboard—only for passengers who had been aboard the prior voyage. On March 5,

Defendant isolated all passengers in their cabins. (Graham Decl., Ex. 67). By then, 11 passengers and 10 crew members were experiencing symptoms of COVID-19. (Graham Decl., Ex. 39).

Michael Dorety began exhibiting COVID-19 Symptoms by March 4 and 5. (Graham Decl. Ex. 62 at 140:8-141:13; 164:17-166:10; 171:1-4; Ex. 63 at 48:12-14; 49:4-8; 49:19-25). Beginning on March 9, Mrs. Dorety repeatedly called the ship's 911 Emergency Medical Line describing her husband's symptoms and requesting immediate medical assistance. (Graham Decl. Ex. 62 at 181:5-10; 182:1-10; 182:21-183:7; 183:16-21; 185:2-3; 192:2-15; 196:4-23; 201:9-18; Ex. 64, Outgoing Call Log.) Defendant told her that "if he wasn't drying," then all it could do is "make a report." (Graham Decl. Ex.62 at 198:1-10; 203:2-7; 203:22-204:3; 204:15-206:1).

On March 10, after nearly 24 hours of repeated 911 calls and pleas for assistance, Defendant finally sent an employee to the Dorety's room. (Graham Decl. Ex. 62 at 206:2-18; 206:23-207:20). The over-the-counter medication Defendant provided was ineffective. *Id.* at 208:1-6; 209:6- 212:14. Hours later, Michael Dorety was taken to the medical center and eventually told that he needed to get off the ship. *Id.* at 209:6- 212:14; 212:16-17. When Defendant finally permitted Mr. Dorety to exit the vessel, the first question the CDC asked Mrs. Dorety was: Why did you wait so long to get him off the ship?" *Id.* at 209:6- 212:17.

On March 20, Michael Dorety passed away as a result of COVID-19. (Graham

**Plaintiff's Memorandum In Opposition**            **2:20-CV-03507-RGK-SK**
**To Defendant's Motion for Summary Judgment**

Decl. Ex 59, Michael Dorety Death Certificate).

## III.   ARGUMENT

### A.   Genuine Disputes of Material Fact Exist as to Defendant's Negligence

#### 1.   Defendant had a heightened duty of care to protect passengers on the Grand Princess from the risks of communicable diseases.

The operator of a vessel in navigable waters owes its passengers "a duty of reasonable care under the circumstances." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959). "In some instances, reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 73 (6th Cir. 1990). "The degree of care considered reasonable in a particular circumstance depends upon the 'extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger.'" *Samuels v. Holland America Line–USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011) (quoting *Rainey*, 709 F.2d at 172). Where the condition leading to the plaintiff's claim is one that is commonly encountered on land and not unique to the maritime context, a carrier must have "'actual or constructive notice of the risk-creating condition' before it can be held liable." *Id.* (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)).

By contrast, a heightened degree of care is required where the risk-creating

condition is peculiar to the maritime context. *See Catalina Cruises v. Luna*, 137 F.3d 1422, 1425–26 (9th Cir. 1998) (concluding that "where the risk is great because of high seas, an increased amount of care and precaution is reasonable"); *Kirk v. Holland American Line*, 616 F. Supp.2d 1101, 1105 (W.D. Wash. 2007)(declining to conclude that risks associated with disembarkation are not unique to cruises); *Kearns v. Celebrity Cruises, Inc.*, No. 95 Civ. 4004 CSH, 1997 WL 729108, at *2 (S.D.N.Y. 1997) (holding that "given the rough weather attending plaintiff's injury, [the defendant cruise line] owed an enhanced duty of care to its passengers"). "The degree of care that is reasonable increases in tandem with an increased risk that is unique to maritime travel." *Schoenfeldt v. Schoenfeldt*, No. C13-5468 RJB, 2014 WL 1910808, at *3 (W.D. Wash. May 13, 2014) (citing *Galentine v. Holland America Line-Westours, Inc.*, 333 F. Supp. 2d 991, 995-96 (W.D. Wash. 2004)); *see also Rainey*, 709 F.2d at 172.

The unique characteristics of cruise ships, and the *Grand Princess* specifically, increased the risk of viral outbreak onboard (Graham Decl., Ex. 21 at 3.1-2), and thus concomitantly increased Defendant's duty of care to its passengers. Thus, while the risk of exposing individuals to COVID-19 is not unique to cruise ships, the *increased risk* of exposing individuals to COVID-19 is peculiar to the maritime context. Thus, Defendant's duty of care to passengers is increased in tandem with this increased risk and danger of communicable disease transmission

**Plaintiff's Memorandum In Opposition**                    2:20-CV-03507-RGK-SK
**To Defendant's Motion for Summary Judgment**

on cruise ships. *Schoenfeldt*, 2014 WL 1910808, at *3.

Defendant argues that cruise ship owners' duty of care is limited to risks of which they have specific knowledge: "knowledge must be specific to the risk, the time period, and —key here—the location of the injury." This argument ignores the heightened duty of care Defendant owed its passengers due to the increased risk of communicable-disease transmission aboard cruise ships.

Defendant only cites cases that apply the ordinary standard of care that would apply equally to shore-side businesses, because the risk-creating conditions in those cases were in no way peculiar to maritime travel and in several cases the injuries did not occur on a ship at all. By contrast, in *Catalina Cruises*, the Ninth Circuit held that a ship owner owed passengers "an increased amount of care and precaution" when the ship encountered severe weather. 137 F.3d at 1425-26; *see also Kearns*, 1997 WL 729108, at *2 ("[G]iven the rough weather attending plaintiff's injury, [the cruise line] owed an enhanced duty of care to its passengers."). Severe weather, like COVID-19, is of course not unique to the maritime context, but the risk of injury due to severe weather is greater on a cruise ship, just as the risk of communicable-disease transmission is greater on a cruise ship. (Graham Decl., Ex. 28). Thus, Defendant owed Plaintiffs an increased duty of care to take reasonable precautions to protect them from the increased risk of contracting communicable diseases, like COVID-19, aboard the *Grand Princess*.

Defendant has a duty to warn passengers of dangers "which are not apparent and obvious to the passenger." *Isbell v. Carnival Corp.,* 462 F.Supp.2d 1232, 1237 (S.D. Fla. 2006). Here, it was not apparent or obvious to the passengers of the *Grand Princess* that (1) they were among other passengers and crew who had been potentially exposed to COVID-19 during the immediate prior voyage; (2) during the immediate prior voyage a concerning number of ILI cases were reported to the medical staff yet the majority of these ILI passengers tested negative for influenza; (3) COVID-19 was capable of spreading like wildfire within the confines of a cruise ship; (4) COVID-19 could be spread by asymptomatic carriers; or (5) while disembarking in *Maui,* passengers on the *Grand Princess* would be crammed together with ILI-patients and COVID-19 positive passengers and crew members. While Defendant knew or should have known of these facts, these risks were not apparent and obvious to passengers like Michael and Susan Dorety.

**2.      Genuine disputes of material fact exist as to whether and when Defendant had actual or constructive knowledge of the risk of a COVID-19 outbreak aboard the *Grand Princess.***

Defendant incorrectly argues that its liability hinges on whether it had "actual or constructive knowledge about COVID-19's presence on *Grand Princess.*" Again, this argument ignores the heightened duty of care Defendant owed to Plaintiffs. Whether or not Defendant had actual or constructive knowledge that COVID-19 was

actually present on the *Grand Princess* at the time Plaintiffs sailed (which is itself disputed), the evidence shows that they had actual or constructive knowledge of the serious *risk* of a COVID-19 outbreak on the ship. Indeed, Defendant admitted that it "had insight into the global situation [about COVID-19] much earlier than most." (Graham Decl., Ex. 21 at 3.1).

The evidence shows that Defendant knew or should have known that there was a substantial likelihood that COVID-19 was actually present on the *Grand Princess* before it set sail on February 21. Defendant knew that a passenger on the immediate prior voyage of the *Grand Princess* had died onboard of an unidentified respiratory illness, that eight crew members were medically disembarked for "complicated influenza," and that the ship's doctor reported concerning levels of ILIs aboard the ship. (Graham Decl., Ex. 58, Ex. 24).

Defendant relies on its contention that guidance from public health authorities instructed that individuals were not suspected of having COVID-19 unless they exhibited both symptoms of fever and lower respiratory illness *plus* an epidemiological link from travel to China or close contact with a person known to have COVID-19. This is not the case. According to WHO and CDC guidance at the time, a person presenting with ILI with an "unexpected clinical course" or "uncertain exposure" should be considered "under investigation" for COVID-19, even in the absence of an epidemiological link to China or to a person suspected of being

**Plaintiff's Memorandum In Opposition**                    2:20-CV-03507-RGK-SK
**To Defendant's Motion for Summary Judgment**

infected. (Graham Decl., Ex. 16). Thus, the presence of 12 individuals on board the *Grand Princess* with ILIs but who tested negative for influenza should have alerted Defendant to the likelihood that COVID-19 was aboard the ship.

In addition, Defendant knew that over 60 passengers and over 1,000 crew from the previous trip, many of whom had been exposed to ILI-individuals, were continuing on the next voyage to Hawaii and could cause additional exposures and cases. Given what Defendant undisputedly knew, it should have known that there was a high likelihood that COVID-19 was present on the ship. At the very least, this is a disputed issue of material fact not appropriate for resolution on summary judgment.

Second, Defendant knew that the virus was spreading rapidly. Defendant knew it was "inevitable…that one or more of our ships have COVID-19 infected persons onboard." (Graham Decl., Ex. 57). On February 28, the *Journal of Travel Medicine* published a study finding that the unique conditions of cruise ships "amplified" the spread of COVID-19 and revealed that extended periods of time on the ship without quarantine increased the spread of the virus. (Graham Decl., Ex. 28). In fact, one month prior to the departure of the *Grand Princess*, Mel Skipp, Defendant's Senior Manager of Health Policy and Maritime Policy & Analysis alerted senior management to the alarming spread of COVID-19 in China. (Graham Decl., Ex. 16). Defendant knew that the rapid spread of the virus in China posed a

serious threat of a global outbreak. Defendant knew the risk of a COVID-19 outbreak to be "very high in China, high at the regional level, and high at the global level." (Graham Decl., Ex. 19). Defendant knew the virus was present in the U.S., and specifically in California, prior to setting sail. (Graham Decl., Ex. 15; Ex. 48). Defendant knew COVID-19 could be spread from person to person through respiratory droplets, that it was more communicable than the SARS virus, and that it could be spread by asymptomatic individuals. (Graham Decl., Ex. 1). And, Defendant knew that there were over 3,500 people aboard the *Grand Princess* representing 54 nationalities. (Graham Decl., Ex. 21 at 3.16). This evidence shows that there are genuine issues of material fact as to whether Defendant knew or should have known of the risk of an outbreak of COVID-19 aboard the *Grand Princess* at the time the ship set sail.

**B.     Genuine Issues of Material Fact Exist as to Whether Defendant Breached its Duty of Care**

Defendant seeks to avoid liability by relying heavily on several cases against laboratories, blood banks, hospitals, and others alleging that these entities had negligently supplied blood infected with HIV. In those cases, however, courts repeatedly held that at the time plaintiffs were administered the infected blood, HIV had not even been identified as the AIDS-causing virus and preventative measures to inactivate the virus in blood products had not yet been discovered. *See McKee v.*

*Cutter Lab'ys, Inc.*, 866 F.2d 219, 224 (6th Cir. 1989); *Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*, 927 F.2d 187, 191 (4th Cir. 1991). In short, these cases are inapposite.

The "how could we have known?" defense does not apply to Defendant in this case. Defendant boasted it "actually had insight into the global situation [about COVID-19] much earlier than most." (Graham Decl., Ex. 21 at 3.1). Defendant experienced a deadly outbreak of COVID-19 aboard the *Diamond Princess*. Defendant knew that cruise ships "increased the risk of communicable disease transmission" and "that an outbreak of COVID-19, specifically, would be difficult to contain" aboard a cruise ship. (Graham Decl., Ex. 21). And, it knew that the best way to prevent a COVID-19 outbreak would have been to cancel the cruise. *Id.* It chose not to do so.

After choosing to put lives at risk and deciding to depart, however, Defendant should have at a minimum isolated and quarantined passengers far earlier than it did, should have instituted the wearing of masks for crew members and passengers who came in close contact with others, and should have stopped hosting activities and large gatherings far earlier than March 4. *Id.*

Defendant claims there is no evidence that it failed to follow WHO and CDC guidance. Even if true, this does not justify summary judgment. While a defendant's failure to follow guidance from regulatory agencies may establish that a defendant

was per se negligent, the inverse is not true: a defendant's compliance with regulatory guidance does not establish that a defendant satisfied its duty of reasonable care.

The Supreme Court first endorsed this principle in the late nineteenth century *Grand Trunk Railway Co. of Canada v. Ives*, 144 U.S. 408 (1892), stating that a railroad company "will not be held free from negligence, even though it may have complied literally with the terms of a statute prescribing certain signals to be given, and other precautions to be taken by it, for the safety of the traveling public at crossings." *Id*. at 420. The Second and Third Restatement of Torts later adopted the approach, declaring that compliance with safety regulations was not conclusive evidence that a defendant exercised due care. Restatement (Second) of Torts § 288C (1965) ("[T]he standard defined is normally a minimum standard,.. This legislative or regulatory minimum does not prevent a finding" of liability.); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 16 (2010) ("An actor's compliance with a pertinent statute … does not preclude a finding that the actor is negligent under section 3 for failing to adopt precautions in addition to those mandated by the statute.").

Courts have routinely applied this approach in a variety of contexts. *See, e.g.*, *Tufariello v. Long Island R.R. Co*., 458 F.3d 80, 91 (2d Cir. 2006) (holding that railroad's compliance with OSHA regulations "does not conclusively demonstrate

**Plaintiff's Memorandum In Opposition**                    **2:20-CV-03507-RGK-SK**
**To Defendant's Motion for Summary Judgment**

that [it] was free from negligence."); *Martinez de Jesus v. P.R. Elec. Power Auth.*, 256 F. Supp. 2d 122, 126-27 (D.P.R. 2003) (declaring that compliance by electric utility with electric line clearances established by National Electrical Safety Code does not entitle it to judgment as a matter of law); *Bartlett v. Mutual Pharmaceutical Co.*, 760 F. Supp.2d 220, 249 (D.N.H. 2011) (instructing jury that compliance with FDA requirement relevant but "not necessarily not conclusive or controlling"). Thus, Defendant's claim that it complied with all relevant safety standards is not grounds for summary judgment.

## C.   There are Genuine Issues of Material Fact as to Whether Defendant's Conduct was "Extreme and Outrageous"

Defendant claims Susan Dorety cannot recover for Michael Dorety's conscious pain and suffering before his death and cannot recover punitive damages. Defendant does not argue there is insufficient evidence for these claims, only that Susan Dorety cannot recover them as a matter of law. Defendant is legally wrong.

In cases involving the death of a non-seafarer within state waters, like this case, courts apply "maritime wrongful death action supplemented by state law wrongful death and survival remedies". *Simmons v. Ware*, 213 Cal. App. 4th 1035, 1046, 153 Cal. Rptr. 3d 178, 187–88 (2013), as modified on denial of reh'g (Mar. 13, 2013); *Yamaha Motor Corporation v. Calhoun*, (1996) 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578. Under general maritime law, Susan Dorety may recover for

Michael Dorety's pain and suffering before his death. *In re Air Crash Off Point Mugu, California*, 145 F.Supp.2d 1156, 1166 (N.D.Cal. 2001) (Non-seafarer case: "Maritime law recognizes both wrongful death actions and survival actions."); *Favaloro v. S/S Golden Gate*, 687 F.Supp. 475, 480 (N.D.Cal. 1987) (recognizing "a general maritime survival action for pain and suffering in non-Jones Act cases."); *see also Complaint of Metcalf*, 530 F.Supp. 446, 459 (S.D.Tex 1981).

Defendant also incorrectly argues that "punitive damages are categorically unavailable." Whether a plaintiff can recover punitive damages under maritime law depends "on the particular claims involved." *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2278(2019). The Court held where there is no federal statute authorizing punitive damages, courts must determine "whether punitive damages have traditionally been awarded" for similar legal claims. *Id.* at 2283.

Numerous maritime cases recognized the availability of punitive damages in cases "where defendant's conduct is outrageous, owing to gross negligence, willful, wonton, and reckless indifference to the rights of others." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008); see also *Churchill v. F/V Fjord*, 892F.2d 763, 772 (9th Cir. 1988) ("[p]unitive damages are available under general maritime law and may be imposed for conduct which shows manifest recklessness or callous disregard for the rights of others or for conduct which shows gross negligence…."); *Noon v. Carnival Corp.*, No. 18-23181- CIV, 2019 WL 3886517, at *13 (S.D. Fla. Aug. 12,

- 22 -

2019) ("[T]he Supreme Court has repeatedly recognized that punitive damages are available for traditional negligence claims that arise in the maritime context"); *Lobegeiger v. CelebrityCruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329 at *7 (S.D. Fla. 2011).

Indeed, in *Birkenholz v. Princess Cruise Lines, Ltd.*, No. 2:20-cv-03167-DSF-JC (C.D. Cal. Aug. 21, 2020), slip op. at 10., a case involving the COVID-19 outbreak aboard Defendant's *Ruby Princess* cruise ship, Judge Fischer denied Defendant's motion to strike plaintiffs' punitive damages request, noting that punitive damages have been awarded in cases where a defendant's conduct is "outrageous" or "deplorable." Slip. Op. at 10.

Whether Defendant's conduct rose to the level of "outrageous" or "deplorable" is a disputed issue of material fact upon which reasonable personsmay differ. Summary judgment should be denied.

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs demonstrated genuine issues of material fact exist as to whether Defendant had knowledge of the risks of a COVID-19 outbreak on the *Grand Princess,* whether Defendant breached its duty of care, whether Plaintiffs established causation, and whether Defendant's conduct rose to the level of outrageousness. For these reasons, Plaintiffs request the Court deny Defendant's Motion for Summary Judgment and grant Plaintiffs all other relief to

Plaintiff's Memorandum In Opposition                    2:20-CV-03507-RGK-SK
To Defendant's Motion for Summary Judgment

which they are entitled at law or in equity.

Dated: AUGUST 25, 2021                 RUSTY HARDIN & ASSOCIATES, LLP


By:    /s/Daniel Dutko
       Daniel Dutko
       *Attorneys for Plaintiffs*

***Additional Counsel for Plaintiffs:***


**THE SINGLETON LAW FIRM**
Gerald Singleton (SBN 208783)
J. Ross Peabody (SBN 98190)
Singleton Law Firm APC,
857 E. Main Street
Ventura, California 93001
Tel: (619) 771-3473
Fax: (619) 255-1515
Gerald@SLFfirm.com
Ross @SLFfirm.com


**RUSTY HARDIN & ASSOCIATES, LLP**
Rusty Hardin
*Admitted Pro Hac Vice*
TX State Bar No. 08972800
Ryan Higgins
*Admitted Pro Hac Vice*
TX State Bar No. 24007362
Daniel Dutko
*Admitted Pro Hac Vice*
TX Bar No. 24054206
Leah M. Graham
*Admitted Pro Hac Vice*
TX Bar No. 24073454
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800
rhardin@rustyhardin.com

**Plaintiff's Memorandum In Opposition**          **2:20-CV-03507-RGK-SK**
**To Defendant's Motion for Summary Judgment**

rhiggins@rustyhardin.com
ddutko@rustyhardin.com
lgraham@rustyhardin.com

**Plaintiff's Memorandum In Opposition**
**To Defendant's Motion for Summary Judgment**

2:20-CV-03507-RGK-SK